The State v. Thomas P. Carpenter, Appellant.—154 S. W. (2d) 81.

·Division Two, September 25, 1941.

*H. P. Lauf, Roy L. Kay* and *John O. Bond* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

TIPTON, P. J.—In the Circuit Court of Moniteau County, Missouri, the appellant was convicted of the crime of first degree forgery in passing, uttering and publishing a false, forged, and counterfeited will, purporting to be the will of Lucy A. Lutes, and his punishment was assessed at ten years in the State penitentiary.

Lucy A. Lutes died in June, 1939, at Tipton, Missouri, where she had lived. She was the aunt of the appellant. In January, 1935, she executed a will drawn by Frank J. Quigley, a lawyer. Under the terms of this will, her estate was left to the appellant and his son, Fern Carpenter. The State's evidence shows that the appellant knew of this will and its contents. The record shows that this was a genuine will, but what became of it is not shown.

Shortly after the death of Lucy Lutes, a Dr. Wilson, of Tipton, found a will in the stairway to his office. This will purported to devise Two Hundred Dollars to each of the relatives of Lucy Lutes and the remainder to Fern Carpenter. The subscribing witnesses were Taylor Redmon and Charley Petree, both deceased at that time. This purported will was taken to the bank and appellant was called to inspect it. When appellant saw the will, he said: "Well, I can do better than that." Later Roy Finley, the bank's cashier, sent this will by registered mail to the probate court. He testified that he did not believe this to be the will of Lucy A. Lutes, but "it wasn't for me to pass on that thing;" that was a matter for the probate judge. The appellant told the probate judge that it was his opinion this was a bogus will. This will was rejected by the probate court.

In August, 1939, P. C. Flood, then president of Tipton Farmers Bank, was walking from his home to town when he was offered a ride by the appellant and his son Fern. Fern got out of the front seat into the rear seat, allowing Flood to ride in the front seat with appellant. After going a short distance, Fern held up a pocketbook and stated he had found it in the back seat of the car. Shortly thereafter, the appellant, Fern Carpenter and Dr. Wilson came into the bank and appellant stated that they had found Aunt Lucy Lutes' will in

the pocketbook. After some discussion as to whether the will was genuine or a forgery, Finley suggested that the appellant see William Redmon, the only living witness to the will, before it was taken to the probate court. Appellant left and shortly returned and stated that Redmon said it was his signature, and he and his father (then deceased) had signed the will at Lucy Lutes' request. At this trial, Redmon was a witness for the State, and his testimony corroborated the appellant's statement. He further testified that the will was a forgery, but that he never told the appellant it was, but signed the will at the request of appellant's son. The will was filed in the office of the probate court on August 26, 1939, and a hearing on the will was held on August 30, 1939. At the suggestion of the probate judge, appellant brought William Redmon to California. He testified in this hearing before the probate court that Lucy A. Lutes had asked him and his father to sign her will; that he had done so, and also signed his father's name because he could not write. The appellant was present at this hearing and was represented by his attorney, Roy Kay. Upon hearing this testimony, Roy Kay asserted that it could not be probated and it was rejected by the court.

Thereafter, one Charles C. Boyles brought in another will to the probate court. The subscribing witnesses to the will were Charles C. Boyles, and C. W. Bloomir. Boyles testified in this case that he signed his name to the document after the death of Lucy Lutes at the request of Perry Carpenter, another son of the appellant. He did not know who signed the name "Lucy Lutes" to the will. He further testified that he at no time had ever talked with appellant about the same.

After this will was rejected, appellant employed additional counsel and brought suit in the circuit court to establish the ▮▮▮ will—that is, the will that was found in the pocketbook. Shortly thereafter, an information was filed charging the appellant and his son Fern with forging this will. When this happened, the appellant's son Perry committed suicide.

Fern Carpenter testified that his father did not know any of these wills were forged; that neither he nor his brother Perry had ever communicated any of the facts to his father; that he and his brother forged the wills, together with William Redmon, and that he intended to plead guilty in his own case.

The appellant testified that he was sixty-six years old; that he had been a Justice of the Peace for twenty years; that he knew nothing of the forgery of any of these wills; that the first time he knew the will was forged was when he went to his son Fern and demanded of him to tell whether the wills were forged; that when his son admitted the forgeries he went to his attorney and had Fern brought before the sheriff and the prosecuting attorney, where he confessed to the forgeries. He further testified that William Redmon told him he had signed the will at Lucy A. Lutes' request; that he took the will to

the probate judge because he knew it was his duty to do so; that he never knew the will was forged until his son Fern confessed to him at the jail; that he had never seen either Boyles or Bloomir, until the day of the hearing in the probate court, and had never at any time talked with either of them; and that neither Fern nor Perry had told him any of the wills were forged.

A number of witnesses testified as to appellant's good reputation for truthfulness and honesty.

The appellant contends that his demurrer to the evidence should have been sustained because the evidence entirely fails to show he had any knowledge the will found in the pocketbook was a forgery. The information was based upon this will.

The State does not contend there was any direct proof that the appellant knew this purported will was forged, but does contend there is sufficient circumstantial evidence to prove such fact.

"The rule is well established that conjecture, suspicion or surmise is not sufficient as a basis of conviction. [State v. Carter (Mo.), 36 S. W. (2d) 917; State v. Eklof, 321 Mo. 548, 11 S. W. (2d) 1033.] Moreover, 'to convict on circumstantial evidence alone, the circumstances must be consistent with each other and with the hypothesis of the defendant's guilt, and inconsistent with every other reasonable hypothesis, including that of innocence—they must be irreconcilable with the innocence of the accused.' [State v. Freyer, 330 Mo. 62, 48 S. W. (2d) 894, 899; State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794.]" [State v. Wilson, 345 Mo. 862, 136 S. W. (2d) 993, l. c. 996.]

To come within the above rule, the State relies upon the following facts and circumstances. First, that when the will found by Dr. Wilson on the stairstep was brought to the bank, appellant said, "Well. I can do better than that." Banker Finley testified that he thought the will was a forgery but he mailed it to the probate court because it was a matter for the court to pass on. The probate court found it was a forged will. We see nothing in this circumstance that would tend to prove guilty knowledge.

Second, the State contends appellant was present when the will was found, and he said that "we have found Aunt Lucy's will," at the bank and at the probate court. If appellant's purpose in driving Mr. Flood to town was to have a witness to the finding of the will, it could not have been planned because Flood testified that on that day he went to town later than he usually did. Appellant's explanation was that he "thought it was Aunt Lucy's will," and he said so. Moreover, before he took the will over to the probate court he went to see the subscribing witness, William Redmon, who testified, as did appellant, that he told appellant he had signed the will at the request of Lucy Lutes. There is nothing inconsistent with his innocence under these circumstances.

468

The State also relies upon the statement made by the appellant that, "I know that Aunt Lucy intended for me to have what she had and I am going to try to get it." When this statement is considered in the light of the fact that appellant knew of the contents of the will drawn by Frank Quigley, we see nothing incriminating in it. This later will was admitted to be genuine, and appellant and his son were the sole beneficiaries under this will. The fact that he filed a civil action in the circuit court to establish the will tends to show that he honestly believed his aunt had devised half of her property to him.

We believe these circumstances are insufficient to prove that the appellant knew this will was forged. His acts were consistent with his innocence. This is especially true when we consider that one son committed suicide shortly after the appellant was arrested and the other confessed after the appellant demanded of him to state a "yes" or "no" as to whether he forged the will.

As has been previously stated, conjecture, suspicion or surmise is not sufficient as a basis for conviction; therefore, it follows that the trial court erred in refusing appellant's request for a directed verdict.

The judgment of the trial court should be reversed and the prisoner discharged. It is so ordered. All concur.