THE STATE v. EMMA HEPPERMAN, Appellant.—162 S. W. (2d) 878.

Division Two, June 17, 1942.

*Roy McKittrick*, Attorney General, and *Olliver W. Nolen*, Assistant Attorney General, for respondent.

684

*Leo A. Politte, L. J. McKim* and *H. K. Pellett* for appellant.

 BARRETT, C.—Emma Lee Snyder Hepperman was convicted of poisoning her husband and sentenced to life imprisonment.

The State's evidence was that on March 3, 1940, Anthony (Tony) Hepperman was a widowed farmer, fifty-one years of age, living about two and one-half miles from Wentzville in St. Charles County. His family consisted of a daughter, Ethel, eleven years of age, and a son, Herbert, twenty-three, who left home shortly after his marriage to Emma. A daughter, Isabel Eagan, lived on a farm a short distance away. Except for a sore toe resulting from frost bite many years before Tony Hepperman was in good health and spirits, interested in operating his ninety-one-acre farm which was valued at approximately $6,000.00.

On Sunday, March 3, 1940, Tony showed his son Herbert the following item from the "Situations Wanted" column of the *St. Louis Globe-Democrat*: "Woman housekeeper for a motherless home. Neat. Pleasant. Age forty-six. Emma Lee, 1419 South Vandeventer." The son says that on the following Monday morning his father wrote a letter (the inference being that it was in answer to the advertisement) and mailed it in the mail box. The following Wednesday the defendant appeared at the farm and asked for Mr. Hepperman. The daughter, Isabel, was at the farm on March 13th and her father introduced the defendant as Mrs. Snyder. Isabel asked

her whether she was the lady dad answered the advertisement for and she replied she was and explained she had inserted her name as "Emma Lee" so everyone would not know she was advertising for a position as a housekeeper.

Later Emma told Isabel she was going to keep house for her father for two more weeks and if he did not marry her in that time she was going to leave. On April 6 Tony, Emma, Ethel, Isabel and her husband attended the funeral of a former friend and each of them testified that the defendant in talking to the father about the funeral said: "If you can go out and put your shoe on to go to a funeral as a pallbearer you can also put on your shoe to go and get married." The defendant and Tony were married April 13, 1940. All of his children and his neighbor brother, Steve, were very much opposed to the wedding.

Ethel became ill in April, her throat hurt, her back and stomach ached, she was nauseated and vomited continuously. She said Emma told her if she would stop vomiting she would be all right. Emma took her to a doctor and told him she ate too many sweets and that she had eaten some bologna and had ptomaine. Emma said her swollen jaws were due to the mumps. The doctor thought she had an ulcerated stomach. She went to her sister Isabel's for six days and when she got back home her father was very sick. Ethel finally got so she couldn't walk straight and was placed in a hospital at St. Charles, where her condition was diagnosed as being due to arsenical poisoning.

By May 18th Tony's physical condition was critical and on May 27th he was admitted to St. Mary's Hospital where he died on May 28, 1940. Without enumerating the symptoms the doctors described a typical arsenical poisoning case. Before he died his stomach was lavaged and the contents, as well as a urine specimen, were preserved and examined. An autopsy was performed and segments of various organs were retained and examined by Mr. Koch of the Highway Patrol. The autopsy corroborated the previous diagnosis of poisoning by arsenic. An analysis of the organs revealed arsenic in the kidney, the liver, brain, intestines, spleen and skin. The total quantity of arsenic found in the parts examined was .5677 grains and it was estimated that Tony had been administered as much as 15 grains—3 to 4 grains being a lethal dose normally.

Specimens of Ethel's hair and nails revealed arsenic.

Two employees of the Wentzville Mercantile Company testified that on April 13, 1940, the defendant purchased a package of Seibert's Fly Paper and about May 9 returned and purchased three more packages. The fly paper was in the wareroom at the time as it was early for flies. Emma stated she wanted it for water bugs. Once she asked for arsenate of lead but the store did not have it and she purchased a package of London purple. Seibert's manufacturing chemist tes-

tified that each sheet of fly paper contained 2 to 4 per cent or eight-tenths of a grain of metallic arsenic and that it was soluble in water. The London purple was 26 per cent metallic arsenic.

Ethel saw the London purple and reported the comments on it as follows: "She said it was poison, and I asked her what it was for; for the potato bugs, or flies or what and she said, 'Well, it is for potato bugs. Do you think I would use it on you?'"

After the defendant came to the Hepperman home she did all the cooking. She also made beer (home brew) which Ethel described as being bitter and as tasting differently from the beer her sister made. Once she employed a neighbor to do the laundry and this lady said the defendant told her she could have some beer but to get it from under the steps as the beer in the back of the basement belonged to Tony's daughter. She also said to this woman, "Yes, Hep's got a thousand dollars and I am going to get it."

F. D. Hagen, a Sergeant in the Missouri State Highway Patrol, testified that on May 22, the Heppermans came to his home and Emma reported a robbery of $43.70 in cash and her watch. She stated she saw a man around the house and identified a neighbor as the prowler. She told Patrolman Barr about the robbery and said Steve Hepperman had accused her of doing something and she wanted to sell the farm and take Tony away with her. She told Steve they had been robbed and indicated the woman who did the washing as being guilty and said they were going to sell the place and leave. Subsequently she admitted the robbery was a fake.

Steve Hepperman testified that on May 24, when he was at Tony's and saw his condition he was insisting on taking him to a doctor and the defendant was of the opinion it wouldn't do any good. During the course of the discussion Tony told Steve he had been poisoned.

Ethel had inherited $1,000.00 from her grandfather, which had been invested in a postal savings bond. The day after Ethel went to her sister's the defendant and her father came to get her to endorse her name on the bond so it could be cashed. They did not have any ink and Emma suggested that she write her name in pencil on a piece of paper and she (Emma) would trace the signature off on the bond and write over it with ink when she got home.

On May 25 the defendant took Tony to Dr. Keller, a dentist in Wentzville, and asked the dentist to remove his teeth. The dentist extracted eight teeth and stated that Tony was so weak and his physical condition so bad he refused to remove more of them, although she was insisting that he take all of them out at that time.

The defendant did not testify. Eight witnesses testified in her behalf. Two doctors testified that Tony declined their services and protested going to the hospital. The attorney for Herbert Hepperman as the administrator of his father's estate testified that Emma

had waived her right to administer on the estate. A drug clerk testified he sold Tony some milk emulsions for calves and colts three years prior to the trial. Another lawyer stated that Steve talked to him the day before Tony died and that Steve was afraid Emma was going to get him to St. Louis and persuade him to transfer his property and Steve wanted to prevent it. Another doctor testified that 2 to 2½ grains of arsenic was a lethal dose and that 8 to 10 grains was an absolute maximum and a man could not take 15 grains of arsenic and live forty-eight hours. This witness was of the opinion that a man's body could not contain 15 grains of arsenic unless it had been administered over a long period of time—two or three years. Dr. Joseph Creech testified he assisted in the autopsy and saw the contents of Tony's stomach and it looked like bile. A roofing man from St. Louis said he made two or three trips out to the Hepperman farm and saw fly paper around on the floors. He was talking about it and Mr. Hepperman gave him one of the packages of fly paper.

The appellant's first assignment of error is that there is not sufficient substantial evidence to sustain the verdict. The appellant's assignment in this respect is amplified by her second assignment that the court erroneously gave Instruction No. 1, which authorized a conviction "upon facts and circumstances instead of solely upon facts" and did not require a finding as to the nature of the poison used or when and how it was administered. In support of her theory the appellant cites cases (only one poison case, and it was there held a case was made for the jury) in which it was held that the circumstances shown were not sufficient to sustain a conviction or that the evidence merely cast a suspicion of guilt on the part of the defendant and was therefore not such proof as is required to sustain a conviction in a criminal case. [State v. Carpenter, 348 Mo. 464, 154 S. W. (2d) 81; State v. Dilley, 336 Mo. 75, 76 S. W. (2d) 1085; State v. Tracy, 284 Mo. 619, 225 S. W. 1009; State v. Richardson (Mo.), 36 S. W. (2d) 944, and State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794.]

The evidence in this case conclusively shows that Tony Hepperman died of arsenical poisoning. Furthermore, after their marriage, the evidence shows the defendant had a motive for desiring his death, the acquisition of all or an interest in his land valued at $6,000.00 and perhaps the acquisition of Ethel's $1,000.00. Now, since it is established that he died from arsenical poisoning and that the defendant had a motive for desiring his demise, what are the facts and circumstances connecting her with the crime and showing that she poisoned her husband?

In the first place she bought the Seibert's fly paper and the London purple, both of which contain arsenic in a form easily soluble in water. Of course, no one saw her administer poison but it has

never been held necessary to produce a witness who could say he actually saw a defendant give his victim a specified kind of poison in a certain manner at a definite hour of the day. Although it is very important, if not essential, to trace poison into the possession of the accused or show he had access to it. [State v. Smith (Mo.), 222 S. W. 455; State v. Hancock, 340 Mo. 918, 104 S. W. (2d) 241; State v. Taylor (Mo.), 190 S. W. 330.] Furthermore, the appellant's purchase of the poisoned fly paper and the London purple was not satisfactorily explained or easily understood because the evidence was that there were no flies at the time and no water bugs in the basement. [State v. Hyde, 234 Mo. 200, 136 S. W. 316.] Consequently, we have these facts thus far: death from arsenic poison, motive on the part of the defendant, possession of the poison and opportunity to administer it in the food or the beer. [State v. Everhart, 316 Mo. 195, 289 S. W. 604.]

In addition to these things what actions, facts or conduct on the part of the defendant point to her guilt?

There was her treatment of her husband when he was extremely ill, such as taking him to the dentist and insisting on the extraction of all his teeth. Her reluctance and even her refusal of permission to talk to his brother Steve, at least on one occasion. Her anxiety to diagnose his ills to the local doctor and especially her statement to one that he had eaten something that poisoned him. When her husband told Steve he was sick she told him he was ▮▮▮ scared because of the prowlers and the robbery. She also told Steve three men came to the house to kill Tony but no one was able to find them and there is no indication that he had known enemies. She appeared to be anxious to dispose of the farm shortly after her marriage and to move away, although her husband had spent his life there. On one occasion and in the presence of Ethel she told him if he would stop vomiting he would be all right. Then, in her presence, Tony told his brother Steve he had been poisoned, although he did not directly accuse anyone of having purposely done so.

There was her treatment of Ethel who undoubtedly was suffering from arsenical poisoning. She always diagnosed her illness as first one thing and then another and always before a competent physician was able to examine her and determine the cause of her troubles. She was overly concerned about cashing the $1,000.00 bond.

There was the circumstance of the beer she made, some of it was for her husband and some for others. It was bitter when Ethel drank it, unlike any beer she had tasted before. There was the admittedly fake robbery. There were Tony's unknown threatening killers. A mysterious and supposedly amorous letter addressed to Tony which she found in the yard. The evidence that there were no flies or bugs requiring the use of either fly paper or London purple.

This is the briefest resume of over six hundred pages of evidence, but it is sufficient circumstantial evidence to sustain the appellant's conviction. The circumstances are consistent with each other and consistent with the hypothesis of her guilt and inconsistent with the hypothesis of her innocence. In each of the poison cases in this jurisdiction all the facts and circumstances in each case have been considered and in each of them some particular element of importance is missing, but when all the circumstantial evidence was cogently compelling the weight and sufficiency of the evidence as to the defendant's guilt was for the jury. The only poison case in which the evidence was held to be completely insufficient is State v. Nesenhener, 164 Mo. 461, 65 S. W. 230, and in that instance there was not even proof that the deceased died of the poison the defendant was supposed to have administered. See and compare the facts and circumstances fully set forth and considered in the other Missouri poison cases: State v. David, 131 Mo. 380, 33 S. W. 28; State v. Thompson, 132 Mo. 301, 34 S. W. 31; 141 Mo. 408, 42 S. W. 949; State v. Shackelford, 148 Mo. 493, 50 S. W. 105; State v. Daly, 210 Mo. 664, 109 S. W. 53; State v. Hyde, 234 Mo. 200, 136 S. W. 316; State v. Taylor (Mo.), 190 S. W. 330; State v. Smith (Mo.), 222 S. W. 455; State v. Everhart, 316 Mo. 195, 289 S. W. 604; State v. Hancock, 340 Mo. 918, 104 S. W. (2d) 241, and State v. Koelzer, 348 Mo. 468, 154 S. W. (2d) 84.

"The jury was told that a conviction might be had upon *direct or circumstantial evidence*" accompanied by explanatory instructions as to the quantity and quality of circumstances under which a conviction upon such evidence would be sustained and consequently it was not error to so instruct the jury "upon the facts and circumstances" rather than solely upon the facts. As has often been pointed out circumstantial evidence is frequently the strongest proof of a fact. [State v. Taylor, supra; State v. Koelzer, supra.] We think the circumstantial evidence showed the kind of poison administered and closely enough the time and manner of its administration, although it is not necessary to specifically instruct the jury to find any more definitely than the court did in this instance the exact kind of poison and the time and place of its administration any more than it is not necessary to specifically charge the same facts except in general terms in the information. [State v. Taylor, supra.]

It is urged that the court's instruction on circumstantial evidence was prejudicially erroneous because it does not require the jury to find "that the evidence is consistent with her guilt and absolutely inconsistent with every other reasonable hypothesis." As we understand it, the appellant is here insisting on exact terminology in a circumstantial evidence instruction and contends that State v. Moxley, 102 Mo. 374, 14 S. W. 969, compels the use of certain, definite language. But that case does not compel the use of certain language or establish a formula which must be exactly followed in each and

every case. The instruction hypothesized the requisites for a conviction and concludes with "but to convict the defendant on circumstantial evidence alone the circumstances proven must be consistent with one another and must, taken together, point so conclusively to her guilt as to exclude every reasonable hypothesis of her innocence" ▮ which, it seems to us, is more emphatic language than the appellant asks. The whole instruction, together with instruction number five, substantially advises the jury that "the circumstances proved must be consistent with each other and with the hypothesis that the defendant is guilty, and inconsistent with the theory of his innocence and with every reasonable hypothesis, except that of guilt." [State v. Maggard, 250 Mo. 335, l. c. 342, 157 S. W. 354, 357; State v. Hancock, supra; State v. David, supra; State v. Conway, 348 Mo. 580, 154 S. W. (2d) 128, 131; 89 A. L. R. 1379.]

▮ Relying on State v. Hyde, supra, the appellant argues it was error for the court to refuse her Instruction "F" withdrawing from the jury's consideration the evidence concerning London purple because there is no evidence the deceased was poisoned with London purple. The State showed the purchase of London purple and the package was found in the house after Tony's death and after appellant's arrest. The trouble with this objection, however, is that the same reasoning would apply to the Seibert's fly paper. There was no evidence he was poisoned with the fly paper, any more than there was no direct evidence he was poisoned with London purple. But the State's evidence was that the fly paper and the London purple were both examined and found to contain arsenic, the London purple twenty-six per cent arsenic, just as the label on the can said. And aside from this evidence, it is not even necessary to refer to treatises on toxicology to learn that London purple contains arsenic. The Encyclopedia Americana (Vol. II, pp. 332-333) article on arsenic says: "The most familiar compound of arsenic is undoubtedly arsenious oxide, . . . or 'white arsenic,' known to the general public simply as 'arsenic.' This is used extensively in the arts, . . . in fly and rat poisons; . . . and for several other purposes. Paris green and London purple are used in large quantities as insecticides." The State's proof was that Tony Hepperman died of arsenical poisoning. Arsenic was found in his system, both before and after his death. Whether it was from the fly paper or the London purple no one knows—it could have been from both. But it was arsenic and both contained arsenic and the case, therefor, differs from the Hyde case in which it was claimed that Col. Swope was administered cyanide of potassium and strychnine and it was erroneously shown that the defendant had other forms of poison and germs in his possession different from anything administered to Col. Swope and this instruction was properly refused.

■ The appellant assigns as error the admission of any and all evidence concerning the cause and nature of Ethel Hepperman's sickness and especially the evidence relating to the examination of her hair and nails which revealed arsenic. The theory of the objection is stated to be that it was remote, had no bearing on the charge of appellant's poisoning Ethel's father and her husband and prejudicially placed the suspicion of another offense upon her. She relies on cases in which it was held to be error when one was being tried for an offense to admit evidence of the commission of other and similar offenses by the defendant at or about the same time. [State v. Buxton, 324 Mo. 78, 22 S. W. (2d) 635, is typical of the cases relied on.] There the defendant was being tried for a certain robbery and the State proved the commission of other robberies by the defendant on the same evening. The court fully reviewed the cases on the proof of other crimes and held that proof of the other robberies was not for the purpose of and did not fall within the rule allowing such proof for the purpose of showing a scheme or general criminal enterprise. Neither were the crimes so related to one another that proof of one tended to prove the other. [See also in this connection State v. Lebo, 339 Mo. 960, 98 S. W. (2d) 695; State v. Austin (Mo.), 234 S. W. 802.] For other exceptions to the general rule see the cases in 3 A. L. R. 1540.

Space does not permit of an exhaustive analysis of the rules and reasons underlying them for the admissibility of evidence which shows or tends to show the commission of an offense other than the one for which the defendant is on trial, suffice it to say that there are certain instances and crimes in which such evidence is admissible even though it may be prejudicial to a defendant's acquittal as evidence pointing to his guilt often is. But, if the proof of another offense logically proves knowledge, intent or design in the commission of the offense charged and for which the defendant is on trial such evidence may be admissible. Or it may show motive, the identity of the defendant as ■ the perpetrator of the crime charged or it may be an act inseparable from the act charged, in which event evidence tending to show the defendant guilty of another crime is admissible. Or, if the evidence tends to establish the charge for which the defendant is on trial it is admissible though it prove him guilty of another offense. [State v. Gruber (Mo.), 285 S. W. 426; State v. Wolff, 337 Mo. 1007, 87 S. W. (2d) 436; State v. Krebs, 341 Mo. 58, 106 S. W. (2d) 428; 2 Wigmore, Evidence, secs. 300-365, particularly Sec. 363 relating to murder by poison.]

In any event the rules as applied to poison cases were definitely settled by State v. Hyde, supra, where the general rule and all its exceptions is fully discussed. [For a criticism of parts of the case see 2 Wigmore, Evidence, sec. 365n.] As to others being poisoned that case made the test of admissibility the identity of the act charged

and that sought to be proved and as we have previously indicated that element is present in the instant case—circumstantial evidence of poison by arsenic. Furthermore, here as in the Hyde case, such evidence negatives accident or mistake and suicide though it is doubtful that these elements are actually present; but, "it is competent to prove that on other occasions the defendant used the same means, with the same effect." [State v. Hyde, 234 Mo. 200, l. c. 233, 136 S. W. 316; State v. Shackelford, supra.]. Consequently, there was no error in the admission of the evidence detailing the nature, cause and course of Ethel Hepperman's sickness which was diagnosed as arsenical poisoning.

The appellant says the court erred "in permitting attorney for State, Mr. Dyer, in his argument to make statement as set out in assignment of error No. 20 commenting on the defendant's failure to testify, and the court further erred in declaring 'That is the evidence.'" Appellant undoubtedly refers to the forty-third assignment in her motion for new trial where it is stated: "Such remarks being a comment on defendant's failure to testify." The record, however, discloses that no such language was used by appellant's counsel, no such objection was made and the court, apparently, did not understand the question nor the objection and did not and was not compelled to rule on the statement.

The following is the official reporter's record of that part of the argument:

"We are not here to attack any individual witness. We are here to prosecute that defendant. And let me point out something to you at this point—was there a witness that sat upon that chair that testified under an assumed name? Was there a person that was afraid to speak out his name before you, and before this court, and before this jury? Can the same thing be said of the defendant in this case?

"Mr. POLITTE: We object to that. He should be reprimanded for that statement.

"The COURT: That is in evidence.

"Mr. DYER: It is in evidence.

"Mr. POLITTE: I want to further object, there was an ad introduced here bearing a different name than this defendant is charged here with, but there is no evidence that that ad bears the name of this defendant or was placed in the paper by her.

"The COURT: There is evidence to show she said she advertised that way because she didn't want everybody to know her true name.

"To which ruling by the Court, the defendant, by her counsel, then and there duly excepted at the time and still excepts.

"Mr. DYER: That is it exactly. That is the evidence. . . . She said to her, 'Then you are the woman that advertised in the news-

paper,' and she said, 'Yes. I used the name Emma Lee because I didn't want my friends to know about my advertisement.' '"

Thus it will be observed that the official record, which we must adopt as the fact, reveals that the prosecutor's argument was not objected to for the reason and on the ground that it was a comment on the defendant's failure to testify. The first objection was merely "We object to that," and the second statement by defense counsel was that there was no evidence that the advertisement referred to the defendant or was inserted in the paper by her. The evidence was as the court and Mr. Dyer stated it to be and no objection was interposed when Isabel Eagan testified to it. It may be that the quoted language is subject to the interpretation that it was a comment on the defendant's failure to testify, but obviously the trial court did not so construe it or understand that to be the object of counsel's objection.

Assuming, however, that the argument was such a comment, the appellant ▮▮▮ is in no position to urge it as error because timely and proper objection was not interposed at the time. "There can be no question but that it is error to allude, either directly or indirectly, to the defendant's failure to testify in his own behalf; the statute is mandatory in that respect, although it is limited to its express terms and requires timely and proper objection and exception." [State v. Conway, 348 Mo. 580, 154 S. W. (2d) 128, l. c. 132; State v. Mosier (Mo.), 102 S. W. (2d) 620.] To compare correct and proper and insufficient untimely objections see: State v. Shuls, 329 Mo. 245, 44 S. W. (2d) 94, and State v. McKeever, 339 Mo. 1066, 101 S. W. (2d) 22. For these reasons there is no merit in this assignment of error.

The defendant filed a motion to suppress evidence, the first part of which alleges that the State wrongfully and unlawfully entered her home after her arrest and "obtained certain parcels of evidence, articles and information, the exact nature and description of which is now unknown to defendant" but which the State intends to use and which was illegally obtained without a search warrant. The second part of the motion says the State intends to use a certain writing, purporting to be a dying declaration by Tony, and prove the commission of certain other offenses by the defendant which would greatly prejudice the defendant's case if the matters were not passed on before the trial began and the defendant asked the court to make inquiry into these things and suppress such evidence. The appellant assigns as error the court's failure to conduct an inquiry into this motion and in overruling the motion. In connection with this assignment the appellant says it was error to receive in evidence Exhibits C and D (the package of London purple and packages of Seibert's Fly Paper) for the reason they were obtained from the

defendant's house in her absence, without her consent and, therefore, illegally.

One of these exhibits was first spoken of while the daughter, Isabel Eagan, was testifying. She said they were preparing for a sale and she found the Seibert's Fly Paper under the oilcloth in the Hepperman cupboard, that she initialed it for identification and gave it to a patrolman. This, of course, could and does not constitute an unreasonable or illegal search and seizure. The constitutional inhibition and protection against unreasonable search and seizure applies only to governmental action. It does not apply to unlawful searches and seizures by individuals and so the defendant could not suppress the evidence as to the fly paper. [State v. Steely, 327 Mo. 16, 33 S. W. (2d) 938; State v. Wilkerson, 349 Mo. 205, 159 S. W. (2d) 794.]

A highway patrolman testified he was at the Hepperman home on May 28, 1940, and that he found a can of London purple which he gave to another patrolman. When asked to describe it the defendant's counsel objected that the article itself would be the best evidence. After he described the London purple an objection was again made that the can itself should be produced as the best evidence. The court was then asked to again consider the motion to suppress, which the court agreed to do and counsel said: "Shall we consider it presented to the court again, Your Honor?" COURT: "Yes, if you want." Mr. POLITTE: "All right." COURT: "Overruled." The State then asked the patrolman to identify Exhibit D, the can of London purple which he said he and Dr. McMurray found in the Hepperman kitchen. A detailed description of the can, its identification and the history of its preservation was given. After counsel asked the court to pass on the motion to suppress no other or further objection was made to the admission of the exhibit for the reason it had been obtained in violation of the defendant's constitutional guaranty against unreasonable search and seizure. Defense counsel then cross-examined the witness fully (ten pages of the record) with reference to the exhibit. Among other things the witness said he obtained Tony's permission to search the house before he went there. It was not until the cross-examination was concluded that counsel asked that the testimony regarding the exhibit be stricken for the reason it was obtained by an unlawful search and seizure.

Assuming, therefore, that the appellant was in a position to object to the introduction of such evidence for the reason it was obtained by an unlawful search and seizure and in violation of her constitutional rights, she failed to do so until after the witness had been fully examined and cross-examined relative to it and such an untimely objection, especially when it was then no surprise to her, was a waiver of the error, if any, in admitting the evidence. [23 C. J. S., Sec. 1078C, pp. 516-517; State v. Sinovich, 329 Mo.

909, 46 S. W. (2d) 877; State v. McGee, 336 Mo. 1082, 83 S. W. (2d) 98.] Early in the trial Isabel Eagan had testified relative to the articles found in the house, the clerks in the store had testified to the defendant's purchase of the articles, hence the defendant was forewarned of them even if she did not know what they were when her motion to suppress was filed.

But aside from all this there was no error in the admission of the evidence and the overruling of her motion to suppress. Whether or not the evidence was unlawfully obtained was a question to be determined on the motion to suppress. [State v. Owens, 302 Mo. 348, 259 S. W. 100; 32 A. L. R. 383.] After the motion is overruled the defendant keeps the question alive by timely objection (State v. Tunnell, 302 Mo. 433, 259 S. W. 128; State v. Hefflin, 338 Mo. 236, 89 S. W. (2d) 938) but the court does not then interrupt the trial to pass on the legality of the search and seizure but only determines whether the evidence is competent and relevant. [State v. Owens, supra.]

In her assignments of error, the defendant says the court erred in failing to conduct an inquiry into the merits of her motion to suppress and before ruling on it. Here again, however, we are bound by the record which sets forth the motion and then recites "the court being made fully informed and advised in the premises, doth overrule said motion to suppress evidence as offered by the defendant." Not only is the legality of a seizure properly determined by a motion to suppress the evidence but the burden is on the defendant to offer evidence and affirmatively demonstrate the illegality of the search and seizure. The motion does not prove itself. [20 Am. Jur., Sec. 396, pp. 357-358; State v. Berry (Mo.), 253 S. W. 712.] In the face of the court's recital that it was fully informed and advised in the premises we must assume that the court did conduct an inquiry or that the defendant offered no evidence in support of her motion, otherwise she would have preserved it in this record and it could then be determined whether the court erroneously overruled the motion. [State v. Williams, 12 Mo. App. 415 (77 Mo. 310); State v. Caldwell (Mo.), 22 S. W. (2d) 793; State v. Smith (Mo. App.), 16 S. W. (2d) 653.] As the record stands there was no error in the admission of the evidence or in overruling the motion to suppress.

The appellant briefs thirteen other assignments of error, none of which may be considered because they are either not borne out by the record or are insufficient in and of themselves.

The appellant says Instruction No. 4 was erroneous because it directs the jury to consider the probability of a witness' statement but fails to instruct the jury that it may also consider the improbability of a witness' testimony. Aside from the fact that we find nothing of the kind in the instruction, which is one of the circumstantial evidence instructions previously considered, there is no such

assignment or objection to the instruction in the appellant's motion for a new trial and, of course, if found could not now be considered. [Sec. 4125, R. S. Mo. 1939; State v. Hayes (Mo.), 295 S. W. 791.]

██ ██ Assignments V and VIII that the court failed to instruct on all the law of the case and erred in refusing Instruction K do not set forth why the proffered instruction should have been given or point out any omission on the part of the court in instructing the jury and, therefore, presents nothing for review. [State v. Sinovich, supra; State v. Shuls, supra; State v. Glover, 330 Mo. 709, 50 S. W. (2d) 1049; State v. Wright, 342 Mo. 58, 112 S. W. (2d) 571.] One of these general assignments concludes by saying "and more particularly on the question of suicide." There is not the slightest evidence of suicide in this case and, therefore, an instruction on the subject was not called for. [State v. Ludwig, 70 Mo. 412; 30 C. J., Sec. 386, pp. 165-166.]

██ It is assigned as error that the court erred in refusing the appellant's Instruction G withdrawing from the jury's consideration threats by the defendant against the deceased's brother, Steve Hepperman. This assignment probably refers to Patrolman Barr's testimony that the defendant in speaking of Steve said: "That son-of-a-bitch accused me of doing something, the ornery bastard should be killed. He is no good and his own brother says he isn't." It is not necessary to decide whether the statement is a threat or should have been withdrawn because there was no objection whatever to the evidence when it was offered. Since the evidence came in ██ without objection it is not subject to being stricken or withdrawn. [State v. Peebles, 337 Mo. 973, 87 S. W. (2d) 167; State v. Young (Mo.), 24 S. W. (2d) 1046.]

So it is with assignments of error XI, XV, XVI, XVII and XIX that the court erred in admitting certain evidence, reference to the record reveals that the defendant made no objection to the evidence when it was offered and cannot now assign its admission as error. [State v. Buckner, 335 Mo. 229, 72 S. W. (2d) 73; State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74; State v. Barbata, 336 Mo. 362, 80 S. W. (2d) 865; State v. Everhart, 316 Mo. 195, 289 S. W. 604; State v. Young, supra.]

██ And the same is true of the assignments that the court erred in indulging in comments and remarks to defense counsel, exciting applause and cheers from the audience and in permitting a State's attorney to argue facts not in evidence and prejudicial to the defendant. The court's allegedly prejudicial remarks are not set out in either the assignments of error or the motion for new trial. [State v. Zoller (Mo.), 1 S. W. (2d) 139.] The objection to the prosecutor's argument does not point out any statement which was not true. An examination of that portion of the argument reveals that some of it was in answer to defense counsel's argument, and the statement seem to

us to be supported by the evidence, except one reference and the court did not rule on the objection to that statement and was not requested to take any further action on the matter. All of which presents nothing for this court's review. [State v. Reagan (Mo.), 108 S. W. (2d) 391; State v. Painter, 329 Mo. 314, 44 S. W. (2d) 79; State v. Cade, 326 Mo. 1132, 34 S. W. (2d) 82; State v. Miller, 263 Mo. 326, 172 S. W. 385; State v. Godos (Mo.), 39 S. W. (2d) 784.]

The two remaining assignments are that the court erred in admitting certain evidence even though the trial court withdrew the evidence and instructed the jury to disregard it. There are instances in which a criminal case will be reversed when improper evidence has been admitted even though the court has given an instruction withdrawing it from the jury's consideration if its prejudicial effect obviously remains despite the court's action. [State v. Martin, 229 Mo. 620, 129 S. W. 881.] But, not only must there be prejudice but the defendant should request further action by the court and move to discharge the jury, otherwise the trial court may assume the defendant to be satisfied with his action and ruling. There was no such motion and the matter may not be raised for the first time in a motion for a new trial. [State v. Robinson (Mo.), 106 S. W. (2d) 425; State v. Sinovich, supra.]

The judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.