**STATE of Missouri, Respondent,**

**v.**

**James Lewis BROWN, Appellant.**

**No. 50835.**

Supreme Court of Missouri,

Division No. 1.

June 14, 1965.

Motion for Rehearing or for Transfer to Court En Banc Denied July 12, 1965.

Norman H. Anderson, Atty. Gen., Louis C. Defeo, Jr., Asst. Atty. Gen., Jefferson City, for respondent.

Norman S. London, St. Louis, for appellant.

HOLMAN, Judge.

Defendant was charged with and found guilty of the offense of tampering with a motor vehicle. The jury fixed his punishment at imprisonment in the penitentiary for a period of five years. See §§ 560.175 (1) and 560.180. (All statutory references are to RSMo 1959, V.A.M.S.) Defendant has appealed from the ensuing judgment.

John Sewell, a contractor living in Overland, Missouri, owned a 1963 Oldsmobile Starfire automobile. On the night of December 2, 1962, he parked the car in front of his home and locked it securely because it contained about $600 worth of tools. On the next morning the automobile had disappeared and Sewell promptly reported its disappearance to the police officers. He later saw the car at a junkyard in a dismantled condition, and recovered some of his tools from the basement garage of a house owned by Mr. and Mrs. Alvin Hathaway located in St. Charles County. At the trial of this case Mr. Sewell identified the certificate of title to the car and a chattel mortgage he had given thereon and those instruments were admitted in evidence. They showed the serial number of the automobile to be 636K01243 and the motor number J016623S. He stated that he had not actually checked the motor number on the automobile, and that he had not given anyone permission to cut up his automobile.

Alvin and Delores Hathaway owned a residence located on Pittman Hill Road in St. Charles County. It had been constructed by "Nationwide Homes" of which Mr. Woodring was the president. A week or so prior to December 9, 1962, Woodring called and asked Alvin if he wanted to rent the residence and Alvin replied that he did. Upon going to Mr. Woodring's office Alvin was introduced to John Paul Spica (who was then using the name of

Price) as the prospective renter. Alvin instructed Woodring to draw up a lease and, at that time gave Spica certain keys to the house because Spica had said he wanted to have an interior decorator do some measuring. Alvin testified that Spica was the only man he saw, but he recalled that Mr. Woodring had stated to him over the phone that he had "a couple of fellows" that wanted to rent the house. The lease was supposed to have been signed on December 9, but Mr. Woodring was not in the office on that day and Alvin did not sign it. However, Woodring did call on that date and advised Alvin that the people were at the house with a moving truck and wanted to know if he wanted to come out and get some patio furniture he had left there. He went to the place immediately and saw that Spica had begun to move into the house. He stated, "It was a surprise to me that he was in there because the lease had not been completed." Since he saw drapes at the windows he thought some one might be there so he knocked at the door and when no one answered he used his key and went into the house. At that time he saw a dismantled car in the garage which was a part of the building. Shortly after he returned home he told his wife what he had seen in the house. He had to go to work that afternoon but his wife, accompanied by some friends, went out to the house at about 10 p. m. to investigate. There were no lights in the house so she used her key and entered and they found no one present. They saw the dismantled car in the garage and she obtained its motor number. She reported the situation to the sheriff's office and, about one a. m., Deputy Sheriff Carl Sellers went with her to the house where he investigated the situation and verified the motor number she had given him. Sellers reported the facts to his office and the office contacted the St. Louis County police and shortly thereafter was notified that the car had been stolen. The motor number obtained by Mrs. Hathaway, and verified by the officers, was the same as that

contained in the instruments admitted in evidence.

At about 10 a. m. on the morning of December 10, Lester Plackmeyer, Sheriff of St. Charles County, and Robert Mudd, trooper with the State Highway Patrol, accompanied by Mr. and Mrs. Hathaway, made another trip to the residence in question. When the sheriff knocked at the front door Spica answered and the sheriff promptly arrested him. The officer then found defendant in the kitchen and he was arrested. These men were arrested on a charge of suspicion of possession of a stolen automobile. Immediately thereafter the officers searched the premises and examined the dismantled automobile. Trooper Mudd took many pictures of the automobile and of the interior of the house, and also found footprints in the grease on the garage floor which corresponded with the print of the boots defendant was wearing. The witness testified that defendant at that time was wearing work clothes which were greasy. Trooper Mudd also testified that he talked with defendant who stated that he had furnished his brother's automobile to bring acetylene tanks to the house that morning; that six automobile locks were found in the kitchen and an acetylene cutting torch and two tanks, as well as a number of tools, were in the garage. The sheriff testified that he was not familiar with the names of defendant or Spica and would have arrested anyone he found in the house at that time.

Fred Solomon, who lived near the Hathaway house, testified that he traveled over Pittman Hill Road several times a week and that between December 3 and December 10, on three different occasions, he saw colored lights (indicating use of an acetylene torch) through the garage windows of the Hathaway house. The lights were bluish, pink, and white.

It was admitted that the sheriff had no search warrant, and had no warrant for the arrest of either the defendant or Spica at the time he went to the Hathaway

house. Prior to trial defendant filed a motion to suppress all evidence, including tangible objects, pictures, and information obtained by a search of the house, which search was alleged to have been unreasonable, illegal, and violative of various sections of the Constitution of Missouri and of the United States.

In support of his motion to suppress defendant offered the testimony of Alvin Hathaway, Lester Plackmeyer, and Carl Sellers. The motion was overruled. The evidence adduced at that time is included in the foregoing statement of the testimony given at the trial and will not be restated. No evidence was offered by defendant at the trial.

We will first consider defendant's contention that the court erred in overruling his motion to suppress evidence obtained by an alleged illegal search and in subsequently admitting that evidence at the trial. We have concluded that there is no merit in that contention.

■ In considering this point we will assume (a fact which is doubtful) that defendant has the same standing to complain of the search that Spica would have had. It is our view that neither would have standing to complain because the undisputed evidence indicates that they did not have lawful, exclusive possession of the premises as tenants of the Hathaways. Since Spica obtained a key upon the representation that he wanted to enter the house to measure some windows, he was, at most, a limited licensee as the owners had not surrendered their right to possession of the house. Under the testimony the rental agreement was not to become effective until the written lease was signed and that was never done. In that situation, the Hathaways had a legal right to enter the house and could authorize the officers to do likewise.

■ There is also an additional ground upon which the trial court's ruling may be sustained. The sheriff had reasonable cause to believe that defendant and Spica had each committed a felony and he made a lawful arrest of both before the search complained of was made. In that circumstance the search was not unlawful. State v. Vollmar, Mo.Sup., 389 S.W.2d 20 [7]. Defendant says, however, that the sheriff's information was obtained as a result of previous unlawful searches and hence such could not be used as the protective element of probable cause. If that were true his contention might be correct. The sheriff's information was, however, obtained from Mrs. Hathaway and the St. Louis County Police Department. Defendant may not complain of Mrs. Hathaway's entry into the house because the constitutional protection against unreasonable search and seizure applies only to governmental action. State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878 [12]. While it is true that a deputy sheriff accompanied Mrs. Hathaway on one of the trips to the house, he did not get any additional evidence or information as she had already seen the dismantled car and obtained the motor number thereof.

In support of his contention defendant relies on Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828, and United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59. Those cases are readily distinguishable upon the facts. In Chapman the officers, with the consent of the landlord, entered a rented house through an unlocked window and seized a still and a quantity of mash. In the prosecution of the tenant the search was held to be unlawful. In Jeffers a search was ruled unlawful where officers entered and searched a hotel room after obtaining the key from the assistant manager of the hotel.

For the reasons stated, we rule that the trial court did not err in overruling the motion to suppress and in admitting the evidence complained of.

Instruction No. 3 reads as follows: "The court instructs the jury that if you find and

believe from the facts and circumstances in evidence in this case, beyond a reasonable doubt, that the defendant, James Lewis Brown, on or about the 10th day of December, 1962, in the County of St. Charles and State of Missouri, did unlawfully, wilfully and feloniously tamper with a motor vehicle, to wit: a 1963 Oldsmobile automobile, Motor Number J016623S, *being the property of one John William Sewell,* by disassembling and removing parts, pieces, and sections of said automobile, all without the permission of the said owner thereof, John William Sewell, then you will find the defendant guilty of feloniously tampering with a motor vehicle and assess his punishment at imprisonment in the penitentiary for a term not exceeding five years, or at confinement in the county jail for a term not exceeding one year, or at a fine not exceeding one hundred dollars or by both such fine and imprisonment. Unless you so find the facts, you will find the defendant not guilty of feloniously tampering with a motor vehicle."

 Defendant contends that the italicized portion of the instruction assumes that John Sewell owned the automobile rather than submitting that issue to the jury for its determination. For the purposes of this opinion, we will assume (but do not decide) that the words complained of do assume the fact of ownership of the automobile in Sewell. We make that assumption because we have in mind that every improper assumption of fact in an instruction does not necessarily render the instruction reversibly erroneous. Under the facts of this case we are of the opinion that the assumption in question was not prejudicial to defendant. This court has stated that "there are numerous cases holding it is not reversible error to assume the existence of a fact which has been clearly proven and is undisputed." State v. Reynolds, 345 Mo. 79, 131 S.W.2d 552, 556. We think that the quoted rule should be applied sparingly and in a careful and restricted manner, depending upon the facts of the particular case. However, we are convinced that the facts in the instant case clearly warrant the application of said rule. Here, the fact of Sewell's ownership of the car was not only undisputed but was proved by the official certificate of title, as well as other documentary evidence, and Mr. Sewell's personal testimony. That the car found in the Hathaway garage was the one owned by Sewell was shown by evidence which, for all practical purposes, was irrefutable. The motor and serial numbers on the car were shown to be the same as those stated in the documents in evidence. Some of the tools left in the car by Sewell were found in the Hathaway garage, and after the dismantled car was taken to a junkyard it was seen and identified by Sewell as his automobile. In view of such unassailable proof of an undisputed fact we rule, as indicated, that the assumption in question does not constitute reversible error.

The next point briefed by defendant relates to alleged error in connection with the testimony of Trooper Mudd. A portion of the trooper's testimony is as follows:

"Q (by Mr. Dalton). Trooper Mudd, did you have an occasion, after the arrest of the defendant, to talk with the defendant Brown? A. Yes, I did. Q. And when was this? A. It was at the Hathaway home and, also at the sheriff's office. Q. And will you relate what was said at the Hathaway home? A. I asked Mr. Brown what his activity was there or what his part was in the Oldsmobile and he denied being in the garage. * * * Q. And did you have a further conversation with him later on? A. Yes, sir. Q. And where was that? A. At the sheriff's office in St. Charles, Missouri. Q. And would you state what you said to him and what he said to you? * * * A. He still denied any knowledge of the Oldsmobile or being in the garage, and I told him that his footprints were in the garage and [that] I, at that time, made the prints of the shoe sole with fingerprint ink, and then he stated that he had been in the garage and had furnished a car to haul acetylene tanks to the

house that morning. Q. What did he say with reference to the car? A. He stated that the 1960 Chevrolet that was backed up to the garage was that of his brother's—Virgil Brown. Q. Did he make any further statement with reference to the acetylene torch or the tanks of acetylene and oxygen? A. Yes, he said that he and the other person present had picked the tanks up on Pennsylvania Avenue that morning. * * * Q. Was there anything further that he stated to you, Officer? A. Not that I recall; he did state—I asked him if he would give us a written statement and he refused to." Out of the hearing of the jury: "Mr. London: Your Honor, at this point, I object to the last statement of the witness that he refused to give a written statement. This all occurred after the defendant was placed under arrest and this amounts to a comment on the defendant's refusal to make a statement, whether written or oral. The defendant, being under arrest, has no duty or obligation to make any statement and his failure or refusal to do so cannot in any way be commented upon by the State's witness. I, therefore, ask that it be stricken and the jury instructed to disregard it and that a mistrial be declared." In the hearing of the jury: "The Court: Ladies and gentlemen, the last question and answer put to this witness were highly improper and the answer should not have been given. It will be disregarded by the jury. Please give it no concern whatever."

■ Defendant contends that the court committed prejudicial error in failing to declare a mistrial. As a basis for this contention defendant relies on the rule that " 'in Missouri the silence of an accused while under arrest is not admissible in evidence against him as he is then under no duty to make any statement.' " State v. Vainikos, Mo.Sup., 366 S.W.2d 423, 427. We do not think that rule has any application in the situation presented. Here it was shown that defendant did not remain silent but had made certain verbal denials

and admissions to the officer. It is reasonable to conclude that the officer was merely asking defendant if he would give a written statement reciting the facts he had stated verbally. Under those circumstances, we doubt that the statement of the trooper was improper or erroneous. However, even if we assume that it was improper, we note that the trial court unequivocally directed the jury to disregard the statement and to "give it no concern whatever." We think that admonition was sufficient to correct any possible error, and we find nothing in the transcript to indicate that the trial court abused its discretion in failing to declare a mistrial.

The final contention of defendant is that the trial court erred in refusing to grant a mistrial because the prosecuting attorney had allegedly failed to properly comply with a pretrial agreement between the attorneys. The matter arose in this fashion: When the prosecuting attorney, in his opening statement, related that he expected Trooper Mudd to testify that defendant had admitted that he had obtained the oxygen and acetylene tanks, defendant's counsel (out of the hearing of the jury) requested a mistrial. His grounds therefor were that he had spoken to Mr. Dalton some time ago "as to the necessity of taking depositions of various witnesses in this case and we agreed between us that, rather than to spend any time in doing so, Mr. Dalton would advise me of the nature of the testimony of the various witnesses; that in accordance with that agreement and relying on that agreement I last week spoke with Mr. Dalton about the testimony of the witnesses and in this talk with him there was absolutely no mention made by him as to any statement of any sort by the defendant relative to the subject of oxygen tanks * * *." In response, the prosecuting attorney stated that "Mr. London did have a conversation with me. However, I want the record to show that that was a telephone conversation. Mr. London had earlier indicated to me that he would contact me relative to going over the testimony

of the witnesses that he had intended to take the deposition of. I did not give any indication that I didn't expect or didn't want him to take depositions of the witnesses. It was a matter of his handling of the case. However, I told him that I would cooperate with the testimony of the witnesses in any way that he wanted and he could go over their statements. I heard nothing more from Mr. London until within the last week when I received a telephone call from him and during this telephone conversation he asked me about the testimony of the witnesses. I believe I answered every question that he asked me. I submit to the court that there may have been a few things that we couldn't handle by a telephone conversation but at the time and under the circumstances I did everything in my power to cooperate with the defendant in that regard." The court overruled the motion for a mistrial.

■■ We agree with the ruling of the trial court. A mistrial should not ordinarily be declared in a judicial proceeding of this nature (with resulting expense and inconvenience to parties, attorneys, witnesses, and others) because of an alleged partial failure of performance by an attorney of a verbal, informal, out-of-court agreement of the nature indicated. The time of courts should not be taken up in endeavoring to determine the terms of verbal out-of-court agreements between attorneys and in deciding whether such agreements have been performed. It is common knowledge that honest disagreements frequently arise as to the terms and manner of performance of such agreements. If defendant's attorney desired to avoid the expense and trouble of taking depositions by an agreement of the type indicated, he had to run the risk of disagreement both as to terms and performance. It is certainly understandable that an attorney, in a telephone conversation, might inadvertently fail to state every fact that every witness would relate in his testimony. It would be rare indeed for

such an occurrence to warrant the granting of a mistrial. We see no basis for a holding that the trial court abused its discretion in failing to grant a mistrial in this instance.

An examination of the record as required by S.Ct. Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.