William M. WILSON, Appellant,

v.

K. B. BAILEY, Warden, Central Prison, Raleigh, N. C., Appellee.

No. 10733.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 9, 1967.

Decided March 22, 1967.

C. Willis Ritter, Baltimore, Md. (Court-assigned counsel), for appellant.

Theodore C. Brown, Jr., Staff Atty., Raleigh, N. C. (T. W. Bruton, Atty. Gen. of North Carolina, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BRYAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

This is a state prisoner's appeal from the dismissal without a hearing of his application for writ of habeas corpus in the district court. The petitioner, Wilson, was accorded a post-conviction hearing in state court to review the constitutionality of his conviction and life sentence for murder in the first degree. Neither the state court nor the district court consulted the transcript of the orginal trial. It has since been made available. Perusal of it is essential to determine the validity or invalidity of the assigned constitutional defects in the trial. Ordinarily, we would remand to the district court for a hearing, or if appropriate, remand with instructions to examine the transcript of the trial. But since we have ourselves studied it and also the transcript of the state post-conviction hearing, we are perhaps in as good a position as the district judge would be to determine whether the petitioner's constitutional rights were violated.[1]

The record discloses that the State offered evidence tending to show, indeed overwhelming in its persuasiveness, that on Saturday, November 25, 1961, petitioner Wilson shot his estranged wife five or six times causing numerous wounds sufficient to cause death. At the time of the homicide, only Wilson and his wife and small daughter were in the apartment. Neighbors heard the shots and observed the arrival and departure of Wilson. On the evening of the same day police were called to a

1. We are influenced against remanding for a hearing by a practical consideration: the dockets of the Eastern District of North Carolina are seriously congested. Even so, we must and ordinarily will insist in the future on careful canvassing of the facts by the district court. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Raleigh motion picture theater and found Wilson in the men's room. He was obviously sick, and the police took him to a local hospital where his stomach was pumped out, disclosing that he had ingested a considerable quantity of poison.

## I. THE INCRIMINATING STATEMENTS

While in the emergency room of the hospital, police officers questioned Wilson about the death of his wife. The most damaging testimony is set out in the margin.[2] This testimony was elicited at the trial without objection having been interposed to the question. Counsel's objection related only to the expression of opinion by the officer, i. e., attempting to say what the Wilson statement "indicated." At the time Wilson made the statement, he had not been charged with the murder of his wife and no warrant had been served upon him. Some several hours later he was served with a warrant charging him with murder and was again questioned and his responses offered in evidence at the trial, again without objection. On this second occasion, Wilson denied his guilt and said in effect that he knew nothing about the slaying.

■ We are not here concerned with the recent doctrines enunciated in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Those decisions apply only to cases in which trial began after the decisions were announced. Johnson v. State

of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

The statements made in the second interrogation were exculpatory—a valid distinction prior to Miranda, and that fact adequately explains the failure of counsel to interpose objection. See Miranda v. State of Arizona, supra, 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed. 2d at 725.

■ The prior statement, made before Wilson was charged with murder and before the warrant was served, came in without objection by admittedly competent counsel. We cannot say even with hindsight that the decision was bad trial strategy. Counsel might well have preferred to have all of the statement rather than to have none of it.[3] We may judicially notice that every competent trial lawyer in North Carolina knows that the contemporaneous objection rule obtains in this State, i. e., that failure to object to evidence is ordinarily a waiver. See Stansbury, North Carolina Evidence § 27, at 49–52 (2 ed. 1963).

Unlike the situation in Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), there was here no motion for directed verdict on the ground of an illegally obtained incriminating statement which can be said to have notified the trial judge of the possibility of an unconstitutional trial. At no time during the entire trial was the judge's attention directed or invited to the question of whether unlawfully obtained evidence had been received.

■ We think this a case of "deliberate by-passing by counsel of the con-

2. "Q. At the time you talked with the defendant about 10 p. m. on the 25th day of November, 1961, what if anything did he tell you occurred?
"A. The only thing that he said that indicated any indication in this particular offense—
"OBJECTION: SUSTAINED
"THE COURT: You can tell what he said.
"A. He made one statement which, said she committed murder, too; I asked him what did he mean and he said she per-

formed an abortion on herself and he reported it to the damn police and they wouldn't do anything about it. He also made another statement. What caused her damn brothers, that they had been following her around and wouldn't let him see the kid. I asked him what did he do and he said nothing. Then he talked in general about his family and the children."

3. One of his retained counsel testified at the post-conviction hearing that Wilson's only available defense was insanity.

temporaneous objection rule as a part of trial strategy" which bars subsequent assertion of the federal ground. See Henry v. State of Mississippi, supra, 379 U.S. at 451–452, 85 S.Ct. 564, 569.

■ Entirely aside from waiver, we think the first statement (which was the only incriminating one), tested by pre-*Escobedo* and *Miranda* standards, was voluntary. The record does not indicate that at that time suspicion had focused on Wilson. The questions propounded were put to Wilson in the presence of the attending physician. He was not in custody. There were no threats and no physical or psychological coercion. Nor does it appear that Wilson was so physically ill as to rob him of conscious control of his responses. Nor is the evidence suggesting the possibility that Wilson was insane at the time he made the incriminating statement at all "compelling" as it was in Blackburn v. State of Alabama, 361 U.S. 199, 207, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

In *Blackburn* the involuntariness of the confession was "conclusively demonstrated" *during the trial,* whereas the voluntariness of Wilson's statement was not even questioned until post-conviction hearing. Blackburn v. State of Alabama, supra, 361 U.S. at 210, 80 S.Ct. 274. Blackburn was arrested and questioned for some eight or nine hours "in a tiny room * * * literally filled with police officers." Blackburn v. State of Alabama, supra, 361 U.S. at 207, 80 S.Ct. at 280. Moreover, in *Blackburn* the incriminating statement was admitted over repeated objections of counsel.

## II.  THE UNLAWFUL SEARCH AND ITS FRUITS

After Wilson was taken to the Wake Memorial Hospital, police officers of the City of Raleigh returned to the vicinity of the motion picture theater, located Wilson's automobile, and searched it, finding an empty 38 Colt cartridge box and a partially empty pint bottle of whiskey.[4] Both items were received in evidence without objection. No question was raised at the trial as to whether or not the search was lawful. Neither the transcript of the trial nor the post-conviction hearing discloses whether or not a search warrant issued to authorize it—although the post-conviction hearing was a plenary one and Wilson was afforded the aid of counsel.

■■ Since June 19, 1961, the date of the decision of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), evidence obtained by a search and seizure in violation of the Fourth Amendment is inadmissible, as a matter of due process, in a state court as it had been previously in a federal court. But despite the increasing tendency to put upon trial judges duties *sua sponte,* there remains a role for defense counsel thought to be indispensible in an adversary system. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Competent counsel may have preferred to have the whiskey bottle accompanied by the empty cartridge box than to have no whiskey bottle at all. We think receiving these items in evidence, without objection, if error at all, is not error of constitutional dimension. The same elements of waiver (discussed hereinabove in Part I) are present. We think Wilson "deliberately bypassed the opportunity to make timely objection in the state court, and thus that the petitioner should be deemed to have forfeited his state court remedies." Henry v. State of Mississippi, supra, 379 U.S. at 450, 85 S.Ct. at 569.

Even if it should be said that the burden of proof is on the state to show the search lawful, surely the state need not shoulder such a burden unnecessarily—

---

4. Some pills and medicine were also found. It is not at all clear that the purpose of the search was to produce incriminating evidence. It may have been done to aid the doctor's identification of the poison taken by Wilson. If so, the search would appear to have been reasonable. See Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (U.S. Feb. 20, 1967).

until it is suggested that the search was unlawful by objection to the evidence or otherwise. Professor Stansbury, in discussing the impact of Mapp v. Ohio on the law of North Carolina evidence, says: "There is no reason to believe that the rules established to serve procedural convenience, such as the presumption of the legality of the search, will be disturbed by the decision * * *." Stansbury, North Carolina Evidence § 121(a), at 275 (2d ed. 1963).

### III. MENTAL COMPETENCE

On December 1, 1961, about a week after the homicide, pursuant to an affidavit of an attorney retained by his family, Wilson was committed to the Dorothea Dix Hospital, the state hospital for the insane, at Raleigh for observation, examination and a report as to his mental condition. On January 30, 1962, Dr. Walter A. Sykes, Superintendent of the Dorothea Dix Hospital, reported that Wilson was not competent to stand trial and recommended that he be committed to the state hospital for treatment, which was done. Nearly a year later, on December 6, 1962, Dr. Sykes again reported that Wilson was still not competent to stand trial. Finally, on February 26, 1963, fifteen months after the initial commitment, Dr. Sykes wrote to the Sheriff of Wake County enclosing a diagnostic conference report stating that Wilson was without psychosis, was able to plead to the bill of indictment, was able to understand the charges against him, and that he knew the difference between right and wrong. Wilson was thereafter returned to the custody of the Wake County Sheriff and tried on October 29–31, 1963.

More than a fourth of the trial time was consumed in the examination of the same Dr. Walter Sykes, who testified that in his opinion the defendant did not know the difference between right and wrong on the day of the homicide, November 25, 1961. Other competent lay testimony was to the contrary.[5]

Wilson's history, related by Dr. Sykes, included a few days in a psychiatric hospital in 1954, at which time he suffered from memory loss and loss of contact with reality. Although there were other hospitalizations, Sykes thought the next significant one was in October of 1961, when Wilson, highly nervous and anxious, was admitted to the Veterans Administration Hospital in Durham.

Although Dr. Sykes was examined extensively by state and defense counsel on the issue of sanity at time of the homicide, he was asked only one question bearing upon Wilson's competency to stand trial. In response, he expressed the opinion that the defendant still is in need of further treatment "but that he has regained or has reached the point where he now knows right from wrong * * *."

No motion was made to the trial judge that there ought to be a hearing to determine Wilson's mental capacity to plead to the indictment and stand trial. Nothing occurred at the trial to indicate to the trial judge the possibility of lack of competence of Wilson to stand trial. At the post-conviction hearing, one of his privately-retained trial counsel testified that he behaved as a normal person, conferred frequently with counsel, and understood what was going on as well as any other defendant who is not used to a trial of a lawsuit. Counsel

---

5. In North Carolina " '[a]nyone who has observed another, or conversed with him, or had dealings with him, and a reasonable opportunity, based thereon, of forming an opinion, satisfactory to himself, as to mental condition of such person, is permitted to give his opinion in evidence upon the issue of mental capacity, although the witness, be not a psychiatrist or expert in mental disorders.' This has been settled doctrine in North Carolina since the pioneer case of Clary v. Clary [24 N.C. 78 (1841)], and under it lay opinion may be received as to the mental capacity of * * * a defendant in a criminal case * * *." Stansbury, North Carolina Evidence § 127, at 296–98 (2d ed. 1963) (footnotes with numerous citations omitted); see, e. g., State v. Matthews, 226 N.C. 639, 39 S.E.2d 819 (1946); see generally 20 Am.Jur. Evidence § 852 (1939); 2 Wigmore, Evidence § 568, at 663–65 (3d ed. 1940); 7 id. §§ 1933–38.

said that he asked Wilson questions during the trial and always got what he considered to be satisfactory answers. At the trial, neither Wilson nor anyone else suggested to counsel that Wilson might not be competent to stand trial. Wilson's other lawyer testified at the post-conviction hearing that he considered Wilson incompetent to stand trial but that he never mentioned his feeling to *anyone,* and particularly did not mention it to the judge. On further examination, this lawyer testified that repeatedly during the course of the trial Wilson suggested questions and advised with counsel concerning various aspects of the case and that he was completely rational in all of the answers given counsel and in making suggestions. Finally, counsel explained what he meant by his previous testimony in these words:

"Mr. Wilson would answer any question that I asked him in an intelligent manner until we got down to his wife and his brothers-in-law and then he became absolutely irrational.

"Q. When you talked about his killing his wife in other words the thing he was on trial for?

"A. That's right."

We cannot say with any degree of confidence that such a reaction is atypical of a competent person in such a situation.

▮ It has been recently held, March 7, 1966, that where the evidence *at trial* raises a "bona fide doubt" as to a defendant's competence to stand trial the trial judge, on his own motion, must invoke an adequate state procedure to protect the right not to be put to trial unless legally competent. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L. Ed.2d 815 (1966).

We think it probable that *Pate* will be given retrospective effect for the practical reason that claims of insanity are likely to be relatively infrequent com-

pared to the high incidence of alleged improper confessions under *Escobedo* and *Miranda* and alleged illegal evidence under *Mapp*. See Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L. Ed.2d 601 (1965). But the question of retrospective operation of *Pate* need not be decided, because assuming it, we think Wilson's case is distinguishable.

At Robinson's trial, the issue of his incompetence to stand trial was raised. Indeed, in summation, defense counsel emphasized: "Our defense is clear * * it is as to the sanity of the defendant at the time of the crime and also as to the present time." The record showed that counsel throughout the proceedings insisted "that Robinson's present sanity was very much in issue." Counsel elicited Mrs. Robinson's opinion of Robinson's "present sanity," and in his summation he asserted that Robinson "should be found not guilty and presently insane on the basis of testimony that we have heard."

Also important to the *Pate* decision was the omission of the state psychiatrist to include a finding of sanity. The stipulation (offered in lieu of testimony) was only that the psychiatrist, if present, would testify that in his opinion Robinson knew the nature of the charges against him and was able to cooperate with counsel when he examined him two or three months before trial.[6]

Robinson "was convicted in an unduly hurried trial without a fair opportunity to obtain expert psychiatric testimony, and without sufficient development of the facts on the issues of Robinson's insanity when he committed the homicide and his present incompetence." Pate v. Robinson, supra, 383 U.S. at 377, 86 S.Ct. at 838.

Wilson, on the contrary, was not an indigent, employed his own competent

---

6. Wilson insists that his situation was *a fortiori*: Dr. Sykes so certified some *eight* months before the trial. But there is this difference: the doctor was present at Wilson's trial and was extensively examined, whereas Robinson's doctor was not.

counsel, was not rushed to trial, was not denied the opportunity to obtain psychiatric testimony, was afforded the opportunity to fully examine Dr. Sykes, the psychiatrist, and took advantage of the opportunity. It was never contended at Wilson's trial that he was incompetent to stand trial, and the only question asked of the psychiatrist in that regard elicited a response tending to show competence.

A comparison of the medical history of Robinson as compared with Wilson is also significant. Robinson had a long, continuous history of disturbed behavior including another homicide prior to the one then being prosecuted and attempted suicide. Wilson's history, previously summarized, was not dramatic prior to the day of the homicide and was not of the sort to suggest to the trial judge the possibility of his incompetence to stand trial—especially considering the presence and testimony of the very doctor who had certified both his sanity and his competence.

We think the evidence in Wilson's case did not raise a "bona fide doubt" as to Wilson's competence to stand trial so as to require that the judge on his own motion should have stopped the trial and inquired into Wilson's present sanity.

## IV. THE CHOICE NOT TO APPEAL AND THE ALLEGED DENIAL OF THE RIGHT TO APPEAL

Immediately after his conviction, Wilson filed a notice of appeal to the Supreme Court of North Carolina. Subsequently, it was withdrawn on the advice of both counsel, who pointed out to Wilson that if he got a new trial he might possibly be thereafter sentenced to death, and that if he were acquitted on the ground of insanity at the time of the crime, which in the opinion of counsel was the only defense he had, he would be committed to the state hospital for the insane. The state judge who conducted a plenary hearing over a two-day period found as a fact that both counsel advised him against perfecting his appeal but left the decision to him, and that he voluntarily, intelligently, and understandingly decided to withdraw and did withdraw his appeal. Our examination of the transcript of the post-conviction hearing shows that this finding is supported by substantial evidence. The state judge further found as a fact that Wilson's action in withdrawing his appeal was *not* caused or motivated by inability to have counsel and to obtain a transcript of his trial. This finding also rests on adequate support in the record. A federal court may accept the findings of fact of a state judge at a post-conviction hearing if supported by substantial evidence and if arrived at in a full and procedurally fair hearing. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 (1963).

Since Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), it has been settled that state procedural defaults, such as a failure to appeal, do not constitute an adequate and independent state law ground barring review by inferior federal courts under the federal habeas corpus statute. It is now clear that "the interest in achieving finality in criminal proceedings is henceforth to be valued less highly than the interest in assuring that no individual is deprived of life or liberty in violation of the Constitution." The Supreme Court, 1962 Term, 77 Harv.L.Rev. 140 (1963). Only one who has deliberately by-passed the orderly procedure of the state courts may be held to have forfeited his state court remedies, Fay v. Noia, supra, 372 U.S. at 438, 83 S.Ct. 822, and even if a deliberate by-pass is found, the district court still has the *power* to grant habeas corpus.

Unquestionably, Wilson exercised his intelligent, rational choice not to appeal. Even now we cannot say that the decision was an unwise one.[7] But we do say, because we cannot significantly distinguish Wilson's situation from

---

7. He is eligible for parole after serving ten years.

that of Noia,[8] that such an intelligent choice is not a "deliberate by-passing of the state court system" which ought to be treated as a waiver of the alleged constitutional defects in his trial.

Even so, we think Wilson's failure to appeal supports our separate conclusions (supra) that he effectively waived the right to object to the incriminating statement and the seized evidence by failing to make timely objection during the trial.

Having considered all of the petitioner's contentions of constitutional invalidity of his trial, we affirm the dismissal of the petition for writ of habeas corpus.

Affirmed.

---

8. Noia also faced the possibility of a death sentence if he appealed and got a new trial. Fay v. Noia, 372 U.S. 293, at 870, 83 S.Ct. 822 (1963).