**Albert YOUNG, Petitioner,**

v.

**Otto C. BOLES, Warden of the West Virginia State Penitentiary, Respondent.**

Civ. A. No. C-67-47-E.

United States District Court
N. D. West Virginia.
July 24, 1967.

---

No attorney for petitioner.

C. Donald Robertson, Atty. Gen. of West Virginia, Morton I. Taber, Asst. Atty. Gen., Charleston, W. Va., for respondent.

MAXWELL, Chief Judge.

■ Petitioner Albert Young, confined in the West Virginia Penitentiary at Moundsville, is serving a life sentence imposed by the Intermediate Court of Kanawha County, West Virginia, on May 28, 1962, following jury trial and conviction for the crime of armed robbery. He raises two claims seeking federal habeas corpus relief.[1]

■ Young asserts in his first claim that the imposition of a life sentence for armed robbery constitutes cruel and unusual punishment. The Petitioner probably suggests that the presumably more serious offense of first degree murder can carry no greater, and perhaps less, penalty in West Virginia.[2]

There is nothing alleged or suggested that determines that the statute in question abridges a federal constitutional right. The United States Court of Appeals for this Circuit has recently rejected such a complaint against the imposition of a death penalty on a convicted rapist who had neither taken nor endangered the life of his victim. Ralph v. Pepersack, 335 F.2d 128, 141 (4 Cir. 1964). This Court finds no reason for a different result in this case.

Young's second claim alleges that inadmissible evidence, seized during a number of unlawful searches conducted without warrant, without consent and not incident to an arrest,[3] was admitted at his trial, over objection.

■ Although Petitioner's allegation of the illegality of the searches was not

1. Petitioner also purports to raise a third claim for federal habeas corpus relief, asserting he was "[d]eprived of opportunity to file timely appeal from Marshall County Circuit Court upon denial of petition for writ of habeas corpus." Quickly stated, this allegation is offered by way of excuse for failing to comply with the requirements for exhaustion of state remedies as laid down by this Court in Miller v. Boyles, 248 F.Supp. 49 (N.D. W.Va.1965). That decision has since been disapproved in Sheftic v. Boles, 377 F.2d 423 (4 Cir. May 4, 1967). But see Ganger v. Peyton, 379 F.2d 709 (4 Cir. May 30, 1967). Although this Court understands that the State of West Virginia may seek further review of the *Sheftic* decision, the status of *Miller* is not vital here. Respondent does not deny Petitioner's contention that he was not advised of the State Circuit Court's decision, dismissing his petition, in time to perfect a timely appeal. This Court accordingly must hold that Petitioner has done all within his power to exhaust state remedies. Cf. Ingram v. Peyton, 367 F.2d 933, 938 (4 Cir. 1966).

2. One convicted of first degree murder by a jury which does not recommend mercy can receive life without possibility of parole. West Virginia Code, Section 62–3–15 (Michie's ed. 1966). However, where the jury recommends mercy, the convicted person may be eligible for parole within ten or fifteen years, depending on the number of his previous convictions. Code, Sections 62–3–15 and 62–12–13 (Michie's ed. 1966). A judge sentencing for armed robbery (which carries only a minimum of ten years and no maximum sentence, Code, Section 61–2–12) could impose a sentence of ninety-nine years, for example, in which case the defendant would not be eligible for parole until he has served one third of that definite term, or thirty-three years. Code, Section 62–12–13(1).

3. The present petition merely complains of an unlawful search and seizure, but the Court has referred to Young's last petition in this Court, Civil Action File Number 599–E, dismissed for failure to exhaust state remedies. There, the claim was more fully set out as here indicated.

directly denied by Respondent,[4] it does not follow that the issue must necessarily be decided within the limited scope of the prayer of the pending petition.

The admission of illegally seized evidence does not, of course, lead automatically to a finding of a constitutional deprivation. At least two additional situations may obtain, either of which may bar relief.

■ In some instances the admission of evidence unlawfully seized occurs as a result of a deliberate tactical decision not to oppose its admission and not through the negligent mistake of defense counsel. See Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Such a decision by an attorney may even bind a client who has not participated in the decision. *Henry*, supra at 451–452, 85 S.Ct. 564.

Although there is much in the trial transcript to suggest that the choice not to oppose the admission of the seized evidence was a deliberate tactic,[5] a second valid reason, making this finding unnecessary, seems to apply here.

■ Assuming that the evidence admitted was illegally seized, and assuming further that there was no waiver of the objection to the illegal seizure, habeas corpus relief is still not warranted if it is clear from the record that the error, if any, was harmless. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (Feb. 22, 1967).

■ On the basis of this Court's scrutiny of the entire trial transcript, submitted with the answer as Respondent's Exhibit Number 19, the Court finds that any constitutional error committed here by allowing the introduction of the seized evidence was harmless. Under the test enunciated in *Chapman*, supra, at 386 U.S. 24, 87 S.Ct. at 828, this Court is "able to declare a belief that it was harmless beyond a reasonable doubt." [6]

4. Respondent argues, incorrectly the Court believes, that all issues have been settled earlier in prior petitions before this Court. See Paragraph 3(a) of Respondent's answer. The Court has scrutinized the seven prior petitions filed by Young in this Court [Civil Action File Numbers: 599–E, 1332–W, 1260–W, 1258–W, 1240–W, 1229–W], and, while it agrees that many of the claims raised have been frivolous, none—except his most recent, 599–E, which was not decided on the merits—raise either of Petitioner's two current claims.

5. Petitioner's attorney did object to the admission of the evidence, but, as the transcript shows [T 43], the basis of the objection was simply relevancy. Petitioner's attorney never questioned the lawfulness of the searches. On the contrary, repeated references to the extensive searches which occurred here, [T 46–50 and 192–93], seemed aimed, not at contesting their legality, but at impressing the jury that, despite a number of thorough searches, neither the stolen money nor the weapon used had been found. Cf. Wilson v. Bailey, 375 F.2d 663 (4 Cir. 1967).

6. In a recent case, decided before the Supreme Court's latest discussion of harmless error in *Chapman*, the United States Court of Appeals for this Circuit remanded a case for hearing, where illegally seized evidence had been allowed in without objection, with the following directions, Stem v. Turner, 370 F.2d 895, 900 (4 Cir. 1966):

We do not hold, of course, that the failure to object to the introduction of the fruits of the search, if determined not to have been the result of a deliberate choice of strategy, always requires an ultimate conclusion that the lawyer's representation was so ineffective as to amount to a deprivation of due process. The Fourteenth Amendment does not require perfection of the lawyer, and one slip does not necessarily invalidate the proceedings. But if it appears that the lawyer was negligent in one particular with resulting prejudice to his client's defense, judicial appraisal of his entire conduct becomes requisite. *A brilliant performance in most aspects of the defense can redeem a blunder*, but a fatal mistake in the context of generally slovenly representation may require a conclusion that the quality of representation was below the minimum required by the Constitution. (Emphasis added.)

In any event, where a petition, as here, does not raise the issue of effective representation, it would seem preferable to utilize *Chapman's* "harmless error" test.

The seized items introduced into evidence, the relevancy of which was tenuous at best, tended to provide only the slightest additional support for a number of eyewitness identifications.

The three persons present in the loan company office on the day of the robbery not only described the robber in detail, in terms of his height, weight, voice and approximate age, but also noted that the robber had two or three strips of scotch tape on his face, apparently used in an effort to disguise himself along with sunglasses and a hat. In Petitioner's car a strip or strips of such tape was found and introduced into evidence. (T 35, 43.)

When Petitioner was arrested, police noticed an adhesive or sticky substance of some sort on his face. (T 38.) A medical officer was called in to examine the substance and he concluded, somewhat ambiguously, that Petitioner may recently have had tape on his face, (T 88), which was scotch tape applied either directly or perhaps with an additional adhesive.

·A small amount of duco cement, a tube of which was found in the glove compartment of Petitioner's car, was put on the skin of a police officer, producing effects similar to that caused by the substance on Petitioner's face. (T 90.) This tube of duco cement was also admitted into evidence. (T 36, 43.)

Another witness for the State who worked in a dry cleaning shop near the loan office, scene of the robbery, testified that she had seen the Petitioner loitering about in the area for three hours on the Saturday prior to the day of the robbery. (T 105.) By way of supporting this testimony the State introduced a sales slip from a Kroger's super market, found in Petitioner's home (T 50). Later the State produced a manager of a Kroger's store located near the loan company, who testified that the slip came from his store and reflected a purchase made by someone on the same Saturday before the robbery.

Contrasted with the minimal impact of the seized evidence introduced is the overwhelming evidence of a number of eyewitnesses identifying Petitioner as the man loitering near the robbery scene for three hours on the Saturday before the robbery and as the man who committed the robbery.

Mr. Russell, Manager of the loan office, testified that Petitioner fit the description of the robber as to height, weight, voice and approximate age. When the arrested Petitioner was brought to the police station and dressed in sunglasses and a hat, Russell said Petitioner looked "exactly like" the robber. (T 72.) On cross-examination, Russell admitted, "I can't definitely say it was him." (T 83.)

After presenting the dry cleaning saleslady, mentioned above, who identified Petitioner positively as the man loitering in the area for three hours on the Saturday before the robbery, the State introduced the second of the three [7] loan company employees present during the robbery—the office cashier. The cashier explained she had studied the robber closely, having once before been asked to describe a robber. (T 145.) Her identification of Petitioner as the robber was also quite positive. (T 147, 163.)

In some ways the most devastating testimony against Petitioner came from a radio store manager whose store was directly below the loan company office. After testifying about unusual noises coming from the office overhead at the time of the robbery, (T 172), the manager gave a partial description that fit Petitioner as the man getting into a car minutes later. (T 174–75.) He also described precisely the car, which fitted Petitioner's car exactly. This witness saw a car of the same make, model and colors as Petitioner's car, then described an unusual emblem on the windshield,

---

7. The third person present at the loan office robbery testified, not for the State, but for the defense. Although he did state that he could not positively identify Petitioner as the robber, [T 202–203], he nevertheless agreed on cross-examination that Petitioner looked very much like the robber. [T 203–204.]

acknowledging a blood donation. (T 174–77.) The description matched Young's car exactly. (T 44.)

Petitioner's entire defense at trial was based on alibi. He produced three women who worked at the State Road Commission, all of whom had seen Petitioner some time on the morning of the robbery. Their testimony as to the precise time was vague and did not create any serious doubt that he could have gone there prior to the robbery.

Petitioner then produced three witnesses who claimed to have seen or been with Petitioner at a poolroom about the time of the robbery. One witness placed Young at the poolroom around 11:45 a. m. (T 233, 238.) Another, Mr. Haley, testified he saw Young there at about noon. (T 242.)

The testimony of the two just mentioned does not conflict with the theory that Petitioner robbed the loan office at around 11:20 a. m. that morning. A rebuttal witness testified that it took him six minutes and fifteen seconds to drive at a moderate speed from the robbery scene to the poolroom. (T 291.)

The third witness testified that Petitioner had been near the poolroom much earlier, around 11:00 or 11:05 a. m., (T 254), and that he again saw the Petitioner about a half-hour later talking with one of the other alibi witnesses, Mr. Haley, in Young's car. However, this second spotting of Petitioner in his car with Haley, shortly after 11:30 a. m., conflicted with the testimony of Haley himself who said, (T 242), that Young had not driven up to the poolroom until around noon. ·

A final alibi witness, Petitioner's wife, testified that her husband had arrived home at 11:56 a. m. (T 270), and remained there the rest of the day. (T 280.) This was contradicted by the testimony of a rebuttal witness, Petitioner's neighbor, who saw Petitioner return home in his car at about 12:25 or 12:30. (T 284–85.)

On balance, the Court feels that the vague, contradictory testimony of the various alibi witnesses was outweighed by the convincing testimony of the eye-witnesses identifying both Petitioner and his car.

In conclusion, the Court reiterates its view that, assuming illegally seized evidence was introduced, and assuming further that neither Young nor his attorney waived objection for tactical reasons,[8] the Court is nevertheless "able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (Feb. 22, 1967).

An order will be entered denying the prayer of the petition.

---

8. As was indicated previously, this Court believes that there may well be enough in this record to warrant a finding of strategic, intelligent waiver. See note 5, supra.