**STATE of Missouri, Respondent,**

v.

**William Prell BRIZENDINE, Appellant.**

**No. 53078.**

Supreme Court of Missouri,
En Banc.

Nov. 12, 1968.

Norman H. Anderson, Atty. Gen., John C. Klaffenbach, Gerald L. Birnbaum, Asst. Attys. Gen., Jefferson City, for respondent.

J. Arnot Hill, J. Whitfield Moody, The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant.

WELBORN, Commissioner.

This is an appeal from a denial of relief in a Rule 27.26 post-conviction proceeding.

By information filed November 12, 1963, in the Jackson County Circuit Court, William Prell Brizendine was charged with murder in the first degree in the death, on October 6, 1963, of George Dave Miller. On March 31, 1964, on the second day of trial, a jury found Brizendine guilty of murder in the first degree and fixed his punishment at life imprisonment. On appeal, the conviction was affirmed. State v. Brizendine, Mo.Sup., 391 S.W.2d 898.

Without prior resort to Criminal Rule 27.26, V.A.M.R., Brizendine filed an application for habeas corpus in the United States District Court for the Western District of Missouri. The court dismissed the petition "without prejudice to file a motion to vacate and set aside his sentence pursuant to Missouri Rule 27.26." Brizendine v. Swenson, D.C., 261 F.Supp. 68, 77.

A pro se motion under Criminal Rule 27.26, V.A.M.R., was filed by Brizendine in the Jackson County Circuit Court on November 12, 1966. The Legal Aid and Defender Society of Kansas City was appointed to represent the petitioner. A hearing on the petition was held in the Jackson County Circuit Court, with the petitioner present and represented by a member of the Legal Aid and Defender staff. The trial court made findings of fact and conclusions of law and entered judgment against the petitioner. This appeal followed.

The circumstances of the offense involved are set out in State v. Brizendine, supra. Briefly stated, Brizendine had previously quarreled with and threatened the victim. According to an eyewitness, Brizendine knocked on the victim's hotel room door. When the victim came to the door, Brizendine said, "Miller, are you my friend?" The victim replied, "Yes," and Brizendine shot him. Brizendine left the hotel immediately, took the weapon involved to the home of a woman acquaintance and told her that he thought he had "killed G. D." Brizendine left the weapon with the woman who called police. Brizendine was arrested within an hour or so.

Brizendine's sister employed Michael Konomos, an experienced Kansas City criminal lawyer, to defend her brother. At the arraignment, on November 12, 1963, defendant was asked whether he had an attorney. When he stated that Konomos represented him, a plea of not guilty was entered by the court. (The transcript of the proceedings upon the arraignment are set out in Brizendine v. Swenson, supra, at 261 F. Supp. 71 and 72. The record of the proceedings does not bear out the minute entry, found in the transcript on appeal, upon which the statement in State v. Brizendine, supra, 391 S.W.2d 901, relating to the proceedings at arraignment, was based. The trial court concluded that the transcript of the proceedings correctly set out what transpired and we accept that finding.) The case was set for January 13, 1964. On that date it was reset for January 27, and on January 23, for February 3.

On January 30, 1964, Konomos filed a motion to have the defendant's "mental

capacity and ability to aid counsel in his defense" determined. The motion stated that the defendant's counsel had endeavored in numerous conferences with the defendant to discuss the charge against him but "that during each of said conferences, defendant has been unable to comprehend the questions asked him; that he is unable to understand and comprehend that he is charged in this Court with first degree murder." The motion stated that, in the opinion of counsel, "defendant is so mentally ill that he is unable to aid in his own defense or to understand the gravity of the proceedings against him" and asked that defendant be examined "regarding [his] mental ability to understand the proceedings against him and to aid counsel in his defense."

The motion was presented to Honorable Harry Hall, Judge of Criminal Division A of the Jackson County Circuit Court on January 30, 1964. In presenting the motion, Konomos stated:

"Well, sir, first of all, I have seen him, since I became his attorney about two months ago, at least twelve to sixteen times. I did not know the man, but the minute that I was called by some friends of his, why, everybody told me that he was using 'goofballs,' that he's crazy. I talked to him; I couldn't get him to understand this is a serious matter, this is a First Degree Murder that may involve his life, and he would laugh, just shake it off like it was nothing. Then he would sit down and write me letters telling me how to try the case and what alibi to put up. Of course, a lot of them do that. I went back and said, 'Will you sit down and talk to me? I want to know how it happened. You can trust me; I want to know.' He started laughing, changed the subject, telling me he was a bad boy, he was discharged from the Marines, a dishonorable discharge, because he was mentally sick. He didn't use the word 'mentally,' because he was sick. I said, 'Tell me when you joined, when you were discharged.' I couldn't ascertain the time, if he was in the Marine Corps or if he was discharged.

"I went back and talked to him again, and from his actions, appearance and speech, and refusal to cooperate with me, I have come to the conclusion, in my opinion, that the man needs mental examination to see whether he can properly defend this charge."

The assistant prosecuting attorney added:

"Strictly for the Court's edification, and just based upon what I know about the man, he has been, as far as I know, if not on hard narcotics, has been on 'goofballs' for I don't know how long; in fact, was convicted of it. The conviction was set aside because of error in the instructions. He had been convicted at the time he was called to testify as a witness for George Lawrence Watson, whom I was trying, and so I saw 'Flapjack,' as we call him, in the courtroom, on the stand. I mean this doesn't—I don't say the man is mentally unstable, but based upon what I know of him, he is goofy. If that is mentally unstable, I don't know."

Upon this presentation, the court ordered defendant sent to the State Hospital at St. Joseph for a period of thirty days "to be examined as to his mental condition."

On February 28, 1964, the acting superintendent of the hospital addressed a letter to Judge Hall. The essential portions of the letter are set out in State v. Brizendine, supra, 391 S.W.2d 900. The letter stated in part:

"This individual shows no evidence of psychosis or insanity. However, it may be stated that under extreme stress and frustration he may develop psychotic behavior.

"DIAGNOSIS: PERSONALITY PATTERN DISTURBANCE, SCHIZOID PERSONALITY.

"Recommendations:

"1) This patient is not psychotic or insane. There is no evidence of neurosis.

He shows a mild degree of mental deficiency which is not disabling.

"2) He has adequate intellectual capacity to assist his counsel in the conduct of his legal defense.

"3) Therefore, we respectfully suggest that his case be handled through the ordinary channels of criminal law."

No record of the receipt of this letter appears in the transcript of the proceedings in State v. Brizendine, supra, but Mr. Konomos made use of it at the trial, which began March 30, 1964, before Honorable Richard C. Jensen. The state produced some thirteen witnesses. Mr. Konomos cross-examined them, except for one or two who testified as to largely formal matters. He cross-examined witnesses who saw Brizendine near the time of the shooting as to whether the defendant was drunk. None said that he was. No cross-examination otherwise appeared to have been intended to produce information relative to the defendant's mental state.

Upon the conclusion of the state's case, defendant's counsel's motion for a directed verdict, which stated that the state had failed to prove beyond a reasonable doubt "that defendant knew right from wrong," was overruled. Thereupon, Konomos stated, for his opening statement: "Well, gentlemen, what we propose to prove is this, that this man is incompetent. This man did not know right from wrong at the time the crime was committed, and we propose to prove that through the Superintendent of Hospital No. 2 at St. Joseph." With the acquiescence of the prosecuting attorney, Konomos then read Doctor Waraich's letter to the jury. Upon the reading of the letter, the defense rested.

The defense offered three instructions which were rejected by the trial court. All would have submitted the theory that the defendant should be acquitted if he did not, at the time of the offense, know right from wrong. The transcript of the trial contains no comments by the court on the offered instructions. No instruction on mental capacity was given by the court.

In his closing argument, Konomos again read Doctor Waraich's letter to the jury, interspersing comments, some of which related to whether the defendant knew right from wrong. In the closing portion of the argument, Konomos stated:

"The defense maintains this: That this is a sick man, that this man had no intent to kill, that he is on the borderline of insanity. The doctor so speaks. The question for you folks to think is this, either on the First Degree Murder or Second Degree Murder: Did the State prove that this man knew the difference between right or wrong? In other words, what was his state of mind at the time that he shot and killed Mr. Miller.

"That is all I can tell you. I presented no evidence because this man can not cooperate with me. One time he tells me how to run the trial, the other time he tells me, 'Well, I don't—'

"MR. SEARS: Just a minute. Judge, I want to object to what this defendant has told his lawyer.

"THE COURT: The objection will be sustained.

"MR. KONOMOS: Very well. In other words, I can not consistently talk with my client to prepare at least a half decent defense."

After the jury's verdict of guilty of murder in the first degree had been returned, defendant wrote several letters to the judge, complaining about his attorney. As a result of such letters, the judge appointed Mr. Kenneth Simon. The defendant objected to Simon, but subsequently wrote that he was satisfied to have Konomos and Simon represent him. They filed a motion for new trial on behalf of the defendant and briefed his appeal to this court.

The matters urged on the appeal related to the "claimed defense of insanity or

criminal irresponsibility." 391 S.W.2d 900. On the appeal, it was concluded that "there is no evidence of insanity or mental irresponsibility in this case * * *." 391 S.W.2d 903. The conviction was affirmed.

The 27.26 motion was filed by Brizendine, pro se. From its examination and the opinion of the United States District Court, supra, it is apparent that the motion was formulated largely from a memorandum by the petitioner's court-appointed attorneys in the Federal Court proceeding. It is subdivided into three points: "I. THE LACK OF COUNSEL, AT THE ARRAIGNMENT." "II. THE COMPETENCY OF PETITIONER TO STAND TRIAL." "III. THE COMPETENCE OF COUNSEL."

Under Point I, the petitioner asserts an absolute right to counsel at arraignment in this, a capital, case. Alternatively, he asserts that he was prejudiced by the lack of counsel at that stage of the proceeding because, under § 552.030, RSMo 1967 Cum. Supp., V.A.M.S. he was required to plead not guilty by reason of mental disease if such defense was to be offered.

Under Point II, petitioner does not allege that he was, in fact, incompetent to stand trial. His claim for relief is based upon the trial court's failure to conduct a hearing and rule upon his competency.

Point III is based upon the claim that Konomos at the trial and before was unaware of Chapter 552 (RSMo 1967 Cum. Supp., V.A.M.S.), which had become effective October 13, 1963, and which changed the procedure and rules applicable to the defense of lack of mental capacity.

At the hearing upon the 27.26 motion, Brizendine was present with his counsel, a member of the staff of the Legal Aid and Defender Society of Kansas City. Petitioner's counsel placed in evidence the transcript of the proceedings at the petitioner's arraignment and at the presentation of the motion for mental examination before Judge Hall. He also requested that the transcript of the proceedings at the preliminary hearing and on the appeal be considered part of the record and upon such record submitted the petitioner's motion.

The state presented Mr. Konomos as a witness. He testified that he had practiced law since January 3, 1923, specializing in criminal law, early in his career in the prosecuting attorney's office, and thereafter in private practice. As an assistant prosecutor and defense attorney he had tried fifty to seventy-five murder cases. Konomos stated that he was employed by Brizendine's sister, for "a substantial fee," to represent the petitioner. Konomos was vague about his presence at the arraignment, stating: "It's probably that I did (appear), I can't remember, but as I stated, it's the practice of our Circuit Court, all the judges, when a defendant appears on any case that's a felony or even a misdemeanor, to enter a plea of not guilty so that way the defendant will not lose any constitutional rights or privileges."

The following colloquy occurred:

"Q * * * Now, were you aware at the time that a defendant is arraigned that if he intends to plead not guilty by reason of insanity he's supposed to suggest it to the Court at that time? A No, sir.

* * * * * *

"Q * * * When do you raise a defense of insanity? A I raise it up in the Circuit Court.

"Q Could you have raised it at the arraignment? A No, sir.

"Q Why not? A Because you cannot raise any. I just asked the Court and the Court did order that he be examined and he was examined.

"Q Now, under the procedures established in Missouri, can you raise a defense of insanity at any time? A Well,

my opinion is that you can, but not in the arraignment, sir. You have to raise it at the trial.

"Q Can you raise it prior to trial? A Of course, you may tell that to the Court but you can't raise it as a matter of defense. I mean, we're talking about practice now.

"Q Now, we're talking about the procedures. A That's right.

"Q When can you raise the question of insanity as a matter of procedure? A No, I didn't raise it because my client was not insane.

\* \* \* \* \* \*

"Q Now, in this particular case, did you raise any question as to this defendant's competency to stand trial or his insanity at the time he committed the crime? A No, sir.

"Q Did you not suggest to the Court that he was unable to assist you in your defense? A I said to the Court he was uncooperative, he was mean. He'd write me a letter and say I'm a fine lawyer, then he'd say I'm no good. I have got letters at home—

\* \* \* \* \* \*

"Q (By Mr. Pelofsky) And did the Court respond to your statements by ordering an examination of this defendant? A He did, sir.

"Q Do you know what the result of that examination was? A I cannot recollect, but he was found sane and we went to trial.

"Q Now, did you at the time of trial intend to raise a defense of not guilty by reason of insanity as a matter of trial strategy?

"A No, I did not, but as a good lawyer, if you'll forgive me, and I'm maybe a little bit arrogant, a lawyer tries everything to defend his client. I may use it tactically, I may have inferred it to the jury or to the Court, but the man was not insane.

\* \* \* \* \* \*

"Q (By Mr. Pelofsky) Mr. Konomos, did you have a number of opportunities to discuss this charge with the defendant? A Several times, at least twelve, fifteen times.

"Q And you had an opportunity to observe him on those occasions. A Yes, sir, I talked to him.

"Q Did you discuss the merits of the charge with him? A I did, sir.

"Q His defenses? A Yes, sir.

"Q Whether or not he was guilty? A That is correct.

"Q Now, I don't want you to tell me what he told you, but did you ask him the question of whether or not he was guilty of this offense? A I did.

\* \* \* \* \* \*

"Q (By Mr. Pelofsky) Now, did you discuss with him the various witnesses who might be called? A Sir, I advised him as to constitutional rights and all the witnesses, and the facets and phases and facts of the entire case many, many times, with him, his step-mother, his father and his brother.

"Q And to your mind he had a full understanding of the nature of the charge and of the witnesses and the possible defenses? A He understood it completely and intelligently.

"Q All right. From your observations of this particular defendant, when taken in light of your past record of defense work and just general involvement in the criminal area, could you form any judgment in your mind as to whether or not this defendant was sane or insane? A I certainly can.

\* \* \* \* \* \*

"THE WITNESS: Yes, I talked to him; as I said, in my practice of over 43 years, I certainly should know whether a man is crazy or insane or out of his mind, and I consider myself a pretty fair lawyer. This man was sane and intel-

ligent but he was uncooperative with me and he changed his mind every other day, so to speak, but he was sane and he understood intelligently what I said to him.

"Q Then again, based on what you learned of this man from your many conversations and in light of your general experience, it was your opinion that you did not intend to raise a defense of not guilty by reason of insanity, is that correct? A That is correct, except I did it as a tactical purpose as a good lawyer.

"Q Well, now, you only raised the question of his ability to cooperate with you in the defense, isn't that correct? A That is correct, sir.

"Q You never did raise to the Court the question that he should be examined to determine his sanity at the time he committed the crime, isn't that correct? A I can't recollect. I don't know whether I did or not. I mean, it's been three or four years ago, I can't remember it.

"Q All right. Now, at the time of trial, you did ask the Court for an insanity instruction, did you not? A I did, sir.

"Q All right. Was that instruction given? A No, sir, because it was apparent that the man was not insane.

"Q There was a report furnished to the Court, was there not?

"A That is correct, sir.

"Q And did you read that report into evidence? A I did, sir, and I argued it to the jury, also.

"Q But you did not obtain an instruction? A No, sir.

"Q Did the defendant testify? A I don't think he did, I mean, I can't remember. He's here, he can tell you. I can't remember, it's been three or four years ago.

"Q All right. Do you recall whether you put any witnesses on?

"A On his behalf?

"Q Yes. A I don't think I did. I cannot remember, as I said, because all the witnesses were adverse to me and to the defense."

On cross-examination, the witness was asked:

"When you stated that he was found sane, you were referring to the examination of Dr. Waraich, the letter that you read into the evidence? A Not necessarily, sir. I believed and I still believe the man is sane and is intelligent to understand what he's doing.

"Q That's not quite my question, Mr. Konomos. During your testimony here you stated that he had a mental examination? A Yes.

"Q And the doctor found him sane? A Yes.

"Q Now, you're referring to Dr. Waraich of St. Joe?

"A No, I'm not. I'm going to violate my oath and my duty to my client if you want me to tell you what happened.

"MR. HILL: If it please the Court, I will withdraw the question."

Mr. Konomos was then excused and defendant's counsel presented, at length, his position. At the conclusion of the presentation, Konomos was recalled and examined as follows:

"Q Earlier, if you will recall, we talked about Chapter 552, which is the mental sections of the criminal code of Missouri? A Yes.

"Q And I asked you if at the time that you were defending Mr. Brizendine you were familiar with the provisions of that statute?

"A I was fully aware of the statute, sir.

"Q All right. And you were aware of the fact that it had in some respects changed the law relating to mental disease in defense?

"A Yes, sir.

"Q Yet, can you explain to the Court why then you did not raise the question in writing as to his insanity? A My client was sane."

The prosecuting attorney also called the defendant as a witness, but the defendant refused to answer any questions, except to give his name. In the course of the discussion of objection to the propounding of questions to the defendant, the following occurred:

"MR. HILL: * * * Not only is the prosecutor attempting, in my opinion, to deny this defendant his constitutional right to remain silent but he's trying to establish something by a man that we have advanced or will advance the position that he's insane. I think it's highly improper.

"MR. PELOFSKY: Are you suggesting to the Court at this time, counsel, that this man is insane at this very moment?

"MR. HILL: I am.

"MR. PELOFSKY: And you're further suggesting that he was insane?

"MR. HILL: I'm suggesting that you stop asking him questions.

"MR. PELOFSKY: I haven't asked any questions, I'm asking you. I want to know if you suggest at this time that the man was insane at the time he committed the crime?

"MR. HILL: Counselor, I will just keep that a secret from you. We're on another question now."

On February 3, 1967, the day following the hearing, the trial court ordered the petitioner transferred to the Western Missouri Mental Health Center for examination "to aid the Court in determining:

"(a) Whether the defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense; and/or

"(b) If on October 6, 1963, the date of the alleged offense, as a result of mental disease or defect, defendant did not know or appreciate the nature, quality or wrongfulness of his conduct, or was incapable of conforming his conduct to the requirements of law.

"(c) Whether the defendant, as a result of mental disease or defect lacked capacity to understand the proceedings against him or to assist in his own defense on or about the 30th of March, 1964, the date of his trial for the offense alleged."

The petitioner was examined at the Center on February 10 and 14, 1967, by Dr. Alfred Owre, Jr., Director of Forensic Psychiatry. Doctor Owre's report was submitted to the court and, in further proceedings on April 21, 1967, incorporated in the record of this case, over the objection of petitioner's counsel. Doctor Owre found, on the basis of Doctor Waraich's report that Mr. Brezendine was fit to proceed in his own case and was able to cooperate with counsel. He expressed the opinion that "the alleged act of murder, first degree, was the product of a state of alcoholic intoxication." Finally, Doctor Owre, noting that Brizendine's mental condition had "deteriorated markedly since Dr. Waraich's psychiatric evaluation of February 28, 1964," made a diagnosis of "Chronic Schizophrenic Reaction, paranoid type, manifested by delusions of persecution and grandeur, auditory hallucinations, ideas of reference and control, and delusional acts." Doctor Owre concluded that appellant was unable to "understand the proceedings against him and to assist in his own defense at this point."

On May 8, 1967, the trial court entered the following findings of fact and conclusions of law:

"1. Defendant was represented at preliminary hearing by counsel of his own choosing, Mr. Michael Konomos.

"2. Defendant was not represented by counsel at arraignment on November 12,

1963, although Mr. Konomos was, according to Mr. Brizendine's statement in the transcript, Defendant's Exhibit 1, page 2, still employed as his attorney.

"3. On January 30, 1964, Defendant was granted a hearing on his motion for mental examination which raised the question of Defendant's capacity to understand the proceedings against him and to assist in his own defense.

"4. On January 31, 1964, the Court sustained Defendant's motion for a mental examination and directed the Defendant to be delivered to State Hospital No. 2 at St. Joseph, Missouri.

"5. A report was sent from State Hospital No. 2 to the Court on February 28, 1964, signed by Dr. G. S. Waraich, stating that Defendant was competent to stand trial and able to assist his counsel.

"6. Following Defendant's return from State Hospital No. 2, no hearing was held by the Court to determine Defendant's competency to stand trial as provided for by Section 552.020, V.A.M.S.

"7. Defendant's counsel had no objection to the report from State Hospital No. 2 and in fact used it in his argument to the jury at the trial of the case as a defense tactic.

"8. Chapter 552 of the Missouri Statutes became effective in October, 1963, and was applicable to the arraignment and other proceedings involving Defendant Brizendine.

"9. No plea of guilty by reason of mental disease or defect was entered by Defendant at any time throughout the proceedings.

"10. On March 31, 1964, Defendant Brizendine was tried to a jury before The Honorable Richard C. Jensen, Judge of Division No. 13 of the Circuit Court of Jackson County, Missouri, was found guilty, and pursuant to the jury verdict sentenced to life imprisonment.

"11. The instruction offered by Defendant's counsel at the close of the case was not phrased in language of Section 552.020 and 552.030, V.A.M.S.

"12. On June 14, 1965, Defendant's conviction having been duly appealed was affirmed by the Supreme Court of Missouri.

"13. Defendant's counsel of his own choosing, Mr. Michael Konomos, has been a member of the Missouri Bar since 1923 and has had extensive experience in the practice of criminal law, principally representing defendants except for a short period of time wherein he was a member of the staff of the Prosecuting Attorney of Jackson County, Missouri.

"14. Defendant's counsel did not intend to raise the question of Defendant's mental disease or defect as a defense but was permitted to and did utilize the report of Dr. G. S. Waraich as a defense tactic, and not because he was suffering from any mental disease or defect or lacked the capacity to understand the proceedings against him or to assist in his own defense.

"15. On April 13, 1967, Dr. Alfred Owre, Jr., M.D., psychiatrist, pursuant to examination at the request of the Court, found the Defendant was heavily intoxicated with alcohol on the occasion when the homicide was committed and the act of murder was the product of a state of alcoholic intoxication.

"16. In his motion to vacate the movant herein raised three contentions and no others: (1) Lack of counsel at the arraignment, (2) The competency of petitioner to stand trial, (3) The competency of counsel.

"CONCLUSIONS OF LAW

"1. Section 552.030 V.A.M.S. permits the entry of a plea of not guilty by reason of mental disease or defect at arraignment, within ten days after arraignment, or by leave of Court (which is always granted). The whole record in the case indicates that Defendant's counsel did not at any time intend to raise the question of not guilty by

reason of mental disease or defect or that defendant Brizendine had at any time prior to the trial of his case given any indication or suggestion to his trial counsel, who had known him for years, that he may have been suffering from mental disease or defect.

"Movant herein asks this Court to take the position that he was prejudiced and his constitutional rights were violated by the failure of trial counsel to appear at his arraignment and enter a plea of not guilty by reason of mental disease or defect when there was no basis, knowledge, information, evidence, or history, of such condition or conditions. It is therefore the conclusion of this Court that the mental defect complained of and now suggested by movant is an afterthought.

"The Supreme Court has held that absence of counsel at preliminary hearing is not per se reversible error. In the case at Bar, Defendant has shown no actual prejudice resulting from the absence of counsel at arraignment. The Court therefore holds that Defendant is entitled to no relief by reason of the allegations contained in Point 1 of his motion to vacate sentence.

"2. Defendant's counsel raised the question of Defendant's competence to stand trial and cooperate with counsel by pretrial motions. The report from Dr. Waraich, State Hospital No. 2, indicated that Defendant was competent to stand trial and assist counsel and Defendant's counsel did not object to this report or request an examination by a physician of his own choosing. Even though no hearing was held to determine Defendant's competence, in view of Defendant's counsel's satisfaction with the report, Defendant was not prejudiced by the absence of a hearing on his competency to proceed nor was there any evidence to indicate other than that the Defendant was competent to stand trial. The Court therefore holds that Defendant is not entitled to relief by reason of the allegations contained in Point 2 of his motion to vacate sentence.

"3. Defendant argues that his counsel's ignorance of the new (January, 1964) law concerning mental disease or defect affecting criminal responsibility deprived him of the effective assistance of counsel. The Court has found that Defendant's trial counsel had many years of experience in the practice of criminal law and has indicated in Findings of Fact and Conclusions of Law set out above that defendant was not prejudiced by any claimed irregularities surrounding the raising and resolution of the question of Defendant's competency to stand trial. The Court therefore holds that Defendant is entitled to no relief by reason of the allegations contained in Point 3 of his motion to vacate sentence."

The fundamental basis of the trial court's judgment, as to Points I and III, is the finding that "Defendant's counsel did not intend to raise the question of Defendant's mental disease or defect as a defense but was permitted to and did utilize the report of Dr. G. S. Waraich as a defense tactic, and not because he was suffering from any mental disease or defect or lacked the capacity to understand the proceedings against him or to assist in his own defense." Based upon this finding, the court concluded that, since the defense of mental incapacity was not to have been raised in any event, absence of counsel at the arraignment was nonprejudicial because, in effect, had counsel been there, he would have entered no plea other than not guilty. The court did not find whether or not counsel was, at the time of arraignment and thereafter, aware of the changes in the Missouri law on the defense of mental incapacity, finding, in effect, that, even if the counsel was ignorant of such changes, he had no basis for and did not intend to raise defenses authorized by the new statutes.

By subparagraph (j) of our Criminal Rule 27.26, supra, our appellate review is "limited to a determination of whether the findings, conclusions and judgment of the trial court are clearly erroneous." Under such review, the findings

of the trial court are presumptively correct. Although our review is not limited to a determination of whether or not there was evidence to support the trial court's findings, findings supported by evidence are not to be rejected unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. See Crosswhite v. State, Mo., 426 S.W.2d 67.

Here, there is no doubt that Konomos' testimony on the 27.26 hearing supports the trial court's finding. Konomos testified that he did not consider the defendant insane at the time of trial and that he raised the issue only as a matter of trial tactics. However, we must, we feel, view such testimony in the light of counsel's actions in the course of his defense of the appellant. The motion for pretrial examination and statement of counsel in support of such motion showed a substantial doubt as to Brizendine's competency at that time and a reasonable basis for such doubt. Although counsel now says that he was satisfied with the report finding his client competent to proceed, he, nevertheless, stated in his argument to the jury that the defendant "cannot cooperate with me. * * * I cannot consistently talk with my client to prepare at least a half decent defense."

As for counsel's statement that he had no basis for a defense of mental incapacity at the time of the offense, it is clear that such was, in effect, the only defense which he did, in fact, attempt to present. He stated in his opening statement that such was the defense, he attempted to make use

of Doctor Waraich's report in support of such a defense, and, finally, he offered instructions for the submission to the jury of such defense.

To be considered with the seemingly inconsistent position of counsel is the complete absence from the matters presented to the trial court and likewise before us for review of any evidence whatsoever of a substantial basis for a defense of incompetency at the time of the alleged act. The only psychiatric evaluation directed to this question negatives the existence of such a defense. Mr. Konomos testified that a not otherwise explained examination gave no support for such a defense.[1] Finally, when an opportunity was afforded appellant's counsel to state his position on the incompetency of appellant at the time of the offense, he declined to do so.

This is not a proceeding in which the appellant is favored with any presumption of innocence such as he was accorded in the original trial. The burden is upon him to establish facts which would entitle him to relief. His failure to fill the obvious deficiencies upon which his claim for relief rests leaves no alternative to our acceptance of the trial court's factual conclusion.

Accepting such factual conclusion, does it support the trial court's conclusions of law regarding the effect of the absence of appellant's attorney at the arraignment? Appellant contends that, under White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.E.2d 193, absence of counsel at arraignment in a capital case is inherently prejudicial. However, the prejudice in White v. State of Maryland was obvious, the defendant's plea of "guilty" being used

---

1. Appellant's counsel had previously raised objection to Konomos testifying to statements made to him by his client, based upon the attorney-client privilege. Konomos declined on such basis to go further into this examination, as above set out. No question is here raised about the right of appellant to rely upon such an objection. In numerous cases, it has been held that a defendant who attacks the compe-

tence of his attorney thereby divests himself of the privilege of relying upon the protection against the attorney's disclosure of communications to him by the client. United States v. Kendrick, 4 Cir., 331 F.2d 110; Pruitt v. Peyton, D.C., 243 F.Supp. 907; United States v. Butler, D. C., 167 F.Supp. 102, 104(2); State v. Kruchten, 101 Ariz. 186, 417 P.2d 510, 515 [1-4].

against him in a subsequent trial upon a changed plea. White v. State of Maryland followed Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114. In Hamilton, arraignment was held to be a critical stage of Alabama criminal procedure because numerous defenses must have been raised at that time or be "irretrievably lost." By § 552.030, supra, a defendant who intends to rely upon the defense of mental disease or defect excluding responsibility must so plead at his arraignment or must give written notice of his intention to rely upon such defense within ten days of a plea of not guilty or at such later time as the court for good cause may permit. There can be little doubt that this provision adds significance to the arraignment step in our criminal procedure. Courts should not treat the step as a mere formality with, as apparently occurred in this case, a stereotyped record entry not related to the actual proceedings.

■ However, we are not convinced that the language of White v. State of Maryland and Hamilton v. State of Alabama is to be applied without regard for the actual holdings of those cases. As stated by the court in State v. Benison, 415 S.W.2d 773, 775: "The rule requiring counsel upon arraignment is not inflexible; it is not required where, as here, no later prejudice could possibly result from the absence of counsel. The absence of counsel during arraignment is not, per se, a violation of the Sixth Amendment."

Furthermore, in Hamilton v. State of Alabama, the Supreme Court's conclusion that in Alabama arraignment was a "critical" stage of the proceeding was based, in part, upon the requirement of Alabama law that the defense of insanity be raised at that time, or be "irretrievably lost." Unless so raised, the defense could thereafter be raised only in the discretion of the trial judge, whose determination was "'not revisable' on appeal." 368 U.S. 53, 82 S.Ct. 157. Under § 552.030, supra, the defense of not guilty by reason of mental disease

may be raised beyond the ten-day period following arraignment "at such later date as the court may for good cause permit." This authority of the trial court, to be exercised favorably "for good cause" is not unreviewable. See State v. Richardson, 329 Mo. 805, 46 S.W.2d 576; State v. Jackson, 344 Mo. 1055, 130 S.W.2d 595; Forester v. Roddy, Mo.Sup., 418 S.W.2d 67. That fact produces a significant difference between the Alabama and our arraignment procedures. See Dean v. Maxwell, 174 Ohio St. 193, 187 N.E.2d 884, 5 A.L.R. 3d 1263, 22 Ohio Ops.2d 144.

■ Although our rules regarding counsel upon arraignment are directed primarily at seeing that an indigent defendant is afforded the right of counsel (S.Ct. Rule 29.01, V.A.M.R.), the fact that a defendant has employed counsel does not authorize the court to proceed upon the arraignment in the absence of such counsel. Although we conclude that, in this case, there has been no deprivation of the right to counsel in violation of the Sixth Amendment, nevertheless, the trial courts must zealously guard the rights of defendants at the arraignment stage, as well as at all other stages of the proceedings.

■ On the incompetence of trial counsel issue, the trial court made no express finding upon the allegation that Konomos was not familiar with Chapter 552, RSMo. The record of the trial as well as the record on the hearing on this motion would lend support for the appellant's allegation of ignorance on the part of his counsel. On behalf of Konomos, we do observe that his motion questioning his client's competency to stand trial was drawn in the language of § 552.020, RSMo 1967 Cum. Supp., V.A.M.S., not the repealed § 545.750, RSMo 1959, V.A.M.S. However, the appellant may not rest solely upon such ignorance unless it "blotted out the essence of a substantial defense [in the trial court] * * *." Bruce v. United States, 126 U.S. App.D.C. 336, 379 F.2d 113, 117. Therefore, if appellant is to convict his counsel

of inadequate representation, the appellant must show there was some basis for asserting the defense of which his counsel allegedly was ignorant. Again, the evidence in this record simply does not afford any basis for a finding that there was reasonable ground for a defense of lack of mental capacity. Appellant elected to stand on the record of the trial, despite the holding in State v. Brizendine, supra, that nothing in that record supported a defense of insanity under either the old or the new versions of the defense. He did not, as he might have done, offer evidence on the motion which would have supported a conclusion that appellant was incompetent at the time of the offense. In fact, the only matter offered at the hearing on the motion was to the contrary effect.

■ The absence of such evidence distinguishes this case from that of Schaber v. Maxwell, 348 F.2d 664 (C.A. 6). In that case, defense counsel failed to comply with Ohio law in an attempted defense of insanity. In holding that the defendant had been denied effective assistance of counsel, the court relied upon not merely the defense counsel's apparent ignorance of Ohio law, but also upon "the facts and circumstances of this case * * *." 348 F.2d 673. Particularly, the court pointed out that the record contained "evidence to raise serious doubts as to the sanity of petitioner, thereby emphasizing the importance of having a trial on his defense of 'not guilty by reason of insanity.'" 348 F.2d 671. Psychiatric evidence was pointed to, as well as lay testimony of a history of erratic behavior on the part of the defendant. See Footnote 5, p. 672. As we have previously noted, any such evidence is lacking in this case and appellant, in his brief, directs our attention to no evidence which he claims would supply a reasonable basis for the defense which he now says his counsel's ignorance deprived him of. Again we may observe the incongruity of the appellant's assertion in this respect and his counsel's position, in the hearing on the motion, that whether he was claiming that the defendant was incompetent at the time of the offense was a "secret."

In Poe v. United States, D.C., 233 F. Supp. 173, relied upon by appellant, the defendant's attorney, not knowing the applicable law as to the right of the prosecution to cross-examine the defendant in the event that he took the stand, advised against the defendant's testifying. As a result, the case went to the jury with no defense evidence whatsoever. Likewise, in People v. Ibarra, 60 Cal.2d 460, 34 Cal.Rptr. 863, 386 P.2d 487, the defendant's attorney failed to object to incriminating evidence because he was unaware of the law which gave the defendant a standing to object. In those cases, it was clearly the ignorance of the attorney which produced the prejudice to the defendant. Here, insofar as the record before us shows, the defendant's difficulty arises primarily from the lack of support for the defense which he now says should have been advanced and his attorney's familiarity with the pertinent law and procedure would not, alone, have avoided the consequences against which the appellant protests.

■ As we view appellant's brief on Point II, the issue of competency to stand trial, we find that it varies from the basic contention found in appellant's motion. The brief alleges that the trial court erred in holding appellant competent to stand trial. However, that is not the thrust of Point II of the petition. The ground for relief there stated is that the failure of the trial court to conduct a hearing and pass upon the issue of his competency to stand trial violated the requirements of due process of law as set down in Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815. As with the alleged issue of responsibility at the time of the act, the petition does not allege that the defendant was, in fact, incompetent to stand trial, nor was any evidence to such effect offered at the hearing. (We also note that appellant's brief here makes some effort to explain the absence of such evidence at the trial on the

basis of the matters asserted under Point I, the absence of counsel at the arraignment. Apparently appellant is urging that failure to plead not guilty by reason of mental incapacity also precluded the presentation of evidence on the issue of competency to stand trial. Competency to stand trial is determined in accordance with § 552.020, supra. It is not dependent upon a plea of not guilty by reason of mental defect and failure to make such plea in no manner affected the appellant's right to proceed under § 552.020, supra.)

 Examination of the court's opinion in Pate v. Robinson, supra, shows the significance of the absence, in this case, of substantial support for the claim of incompetency to stand trial. In Pate, there was evidence on a broad scale relating to the defendant's mental capacity. The defendant had had a long history, adduced at the trial, of behavior evidencing mental illness. The Supreme Court held that, in such circumstances, the trial court had the duty to consider and pass upon the competency of the defendant to stand trial, regardless of the absence of request by counsel for either the state or the petitioner. That it was the large mass of evidence which produced such requirement is obvious from subsequent cases in which it has been held that a mere suggestion of incompetency to proceed is not sufficient to invoke the *Pate* rule. United States ex rel. Rizzi v. Follette, 2 Cir., 367 F.2d 559, 561; Hawks v. Peyton, 4 Cir., 370 F.2d 123, 125; Wilson v. Bailey, 4 Cir., 375 F.2d 663, 667–669. Here, although defendant's incompetency had been suggested, psychiatric examination produced the conclusion of competency and was sufficient to warrant trial, in the absence of further objection. See Whalem v. United States, 120 U.S.App.D.C. 331, 346 F.2d 812; Heard v. United States, D.C. D.C., 263 F.Supp. 613.

We do not find the trial court's conclusion "clearly erroneous" (S.Ct. Rule 27.26(j), supra). The judgment is affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., written in Division One, is adopted as the opinion of the Court en Banc.

All concur except SEILER, J., who dissents in separate dissenting opinion filed.

SEILER, Justice (dissenting).

It seems to me that the mandatory provisions of § 552.020.3,[1] requiring that where "the finding [on fitness to proceed] is contested the court shall hold a hearing on the issue", have not been followed here and that the judgment must therefore be vacated and defendant given a new trial. I also am of the opinion the findings, conclusions and judgment of the trial court in the 27.26 proceeding are clearly erroneous.

In the original murder trial, a motion was filed for an examination of "defendant's mental ability to understand the proceedings against him and to aid counsel in his defense". This was sufficient to bring the provisions of § 552.020 into play even if defendant's then counsel was unaware of the statute. The motion was supported by strong representations made to the trial court by defendant's then counsel, which the court, in view of the Canons of Ethics, rule 4.22, was entitled to expect were spoken in "candor and fairness". Even the assistant prosecuting attorney said that while he did not know if defendant was "mentally unstable", he considered the defendant "goofy". So there can be no question but that defendant's fitness to proceed was put in issue.

As the trial court found in the present 27.26 proceeding, following defendant's return from the mental examination made at State Hospital No. 2 in 1964, "no hearing was held by the Court to determine defendant's competency to stand trial as provided for by § 552.020, V.A.M.S."

Despite this, in his opening statement to the jury in the original trial, defend-

1. All statutory references are to V.A.M.S.; all rule references are to V.A.M.R.

ant's then counsel took the position that defendant was not competent to proceed, saying that defendant would not take the stand "because we shall prove through medical authority that the man is not competent to cooperate with me". Later he told the jury he would prove "this man is incompetent".

In his final argument to the jury, defendant's then counsel challenged the conclusion of the examining doctor contained in the above report that "He has adequate intellectual capacity to assist his counsel in the conduct of his legal defense", saying to the jury "That, I will not accept. He is not a lawyer. He does not know what I require of my client. When he cannot answer me intelligently, so I can handle his defense properly." Later counsel said to the jury: "That is all I can tell you. I presented no evidence because this man can not cooperate with me * * * I can not consistently talk with my client to prepare at least a half decent defense."

It is thus quite clear that at the time of the first trial defendant did in fact contest the finding of the examining physician that defendant was competent to proceed. It may not have been done in the usual way, but to quote from the opinion in State v. Brizendine (Mo.Sup.) 391 S.W.2d 898, 901, "As counsel for defendant here states, 'It is apparent from the transcript that neither appellant, the State, nor the Court, was aware of, or at least proceeded under Chapter 552.'" This failure to be aware of the statute cannot, of course, eliminate the requirement of a hearing by the court on the issue of fitness to proceed, where as here, it is apparent defendant was and is contesting the finding made by the examining physician.

At such a hearing § 552.020 provides the report may be received in evidence, but the defendant has the right to summon and cross-examine the physician and to offer evidence. The report in question, made by Dr. Waraich, dated February 28, 1964, is a good example of why such reports should be subject to cross-examination where the finding is contested. The way the report is written Dr. Waraich himself decided the issue. He declared, " * * * He has adequate intellectual capacity to assist his counsel in the conduct of his legal defense * * *. Therefore, we respectfully suggest that his case be handled through the ordinary channels of criminal law."

But there is no showing that Dr. Waraich was aware of what the legal standard of fitness to proceed is or whether on examination by counsel, the doctor would testify to facts which would support a judicial finding of fitness to proceed. Defendant's counsel recognized this when he pointed out, "That, I will not accept" (referring to the doctor's conclusions) and that the doctor "Even tells the State what to do in this case." In Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed. 2d 824, it is said the " 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him' ". All the psychiatrist is competent to do is to render a medical report. The trial judge is the one who knows about criminal proceedings and who is qualified to pass on whether defendant is competent to proceed within the requirements of the test laid down above. This unquestionably is why the legislature provided for a hearing in contested cases and for a determination by the trial judge. As I understand it, this means a full and fair evidentiary hearing to the end of determining an issue of fact, and findings and a decision made by the trial court on the basis of that evidence. This was not done in this case.

In the present 27.26 proceeding the trial court after finding as a fact that no hearing was held as required by § 552.020, arrives at the conclusion that defendant was not prejudiced by lack of a hearing on his competency to proceed. In arriving at

this conclusion the trial court seems to rely on the following:

1. The conclusions reached by Dr. Waraich in the report of February 28, 1964, that defendant was competent to stand trial.

2. Failure of defendant's then counsel to object to the report.

3. Failure of defendant's then counsel to request an examination by a physician of his own choosing.

4. Defendant's then counsel's satisfaction with the report.

5. Defendant's former counsel's testimony at the 27.26 hearing that the claim of incompetency to proceed was merely a defense tactic.

6. The February 1967 report of Dr. Owre, another psychiatrist at State Hospital No. 2, received, over objection, as a part of the 27.26 hearing, that the crime was a product of a state of alcoholic intoxication and that defendant was heavily intoxicated at the time.

I have already discussed the problems involved in placing full reliance on Dr. Waraich's conclusions without giving defendant an opportunity to cross-examine or present evidence of his own. See also, Butler v. United States (C.C.A. 10) 361 F.2d 869, holding a district court erred in a proceeding under 28 U.S.C. § 2255, in accepting a similar report without a hearing and an opportunity to cross-examine the doctor. See, also, Brizendine v. Swenson (D.C.W.D.Mo.) 261 F.Supp. 68, 75, and People v. Gonzalez, 20 N.Y.2d 289, 282 N.Y.S.2d 538, 229 N.E.2d 220, 222. In Heard v. United States, D.C.D.C., 263 F.Supp. 613, cited on this point by Commissioner Welborn, the court points out the transcript was "devoid of expressions of doubt as to competency by any of the parties." That is not the case here, where defendant's then counsel in the murder trial many times stated defendant was not competent to proceed.

Two, 3 and 4 above can be considered together. I do not believe it can be said that defendant's then counsel's failure to object to the report can operate to avoid the necessity for the hearing required by § 552.020 when the finding is contested, as it in effect was, nor do I believe it can fairly be said that defendant's then counsel was satisfied with the report. As in Pate v. Robinson, 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815, the record in the first trial shows that defendant's then counsel insisted throughout the trial that defendant's fitness to proceed, his competency to cooperate in his defense, was very much in issue. Failure of defendant's then counsel to request an examination by a physician of defendant's own choosing gets back again to counsel's unawareness of defendant's rights under § 552.020. Although defendant's then counsel was employed by defendant's sister, counsel claimed in open court during the trial defendant did not have the money to employ a psychiatrist (it is to be noted that defendant is here as an indigent and the trial court also permitted him to appeal as a pauper from his original conviction). During the state's closing argument, the prosecutor was pointing out that if there were any question of insanity, defendant's lawyer would have psychiatrists in court to testify, to which counsel objected, "because we haven't got the money or the means." Under § 552.020 defendant was entitled as a matter of course to an examination by a physician of his own choosing and the expense could be taxed as costs under § 552.080. So it would not appear that defendant's counsel's failure to request an examination by a physician of defendant's own choosing was necessarily because defendant did not want one. It could well have been as stated, because counsel had no funds with which to employ an examiner, yet at the same time was not aware one could be obtained by court order under § 552.020.

As to 5, the record is clear the court in the 27.26 hearing accepted defendant's former counsel's statement that there sim-

ply was no truth in what counsel first told the court and later the jury about defendant's lack of fitness to proceed, that counsel knew all along defendant was sane and understood the charge, the witnesses, and the possible defenses, that this was just a matter of trial tactics. Parenthetically, it is to be noted that rule 4.15, How Far a Lawyer May Go in Supporting a Client's Cause, points out that "Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class, and to deprive the profession of that full measure of public esteem, and confidence which belongs to the proper discharge of its duties, than does the false claim * * * that it is the duty of the lawyer to do whatever may enable him to succeed in winning his client's cause."

Be that as it may, the fact is most evident that the testimony at the 27.26 hearing of defendant's former lawyer was highly self-serving, because one contention advanced by defendant in the hearing was prejudice through lack of effective assistance of counsel in failing to be aware of Chapter 552 and what could be done for defendant under it. Therefore, if it appeared that there was no merit to the claim of lack of fitness to proceed or not guilty by reason of mental defect, then, of course, there could be no prejudice to defendant and counsel would not be remiss in failing to raise the defenses and invoke the procedures available under Chapter 552. Without taking time to compare the testimony at the 27.26 hearing with what counsel said at the original trial point by point, or to quote the statements which were the direct opposite of what had earlier been said, it is apparent defendant's former counsel said one thing at one time and something very different at another.

What this does to a witness' testimony is discussed by Professor Wigmore in his work on Evidence, Vol. III, 3rd Ed., § 1017, on Self-Contradiction, where he states, pp. 685–686: " * * * we resort simply to the witness' *own prior statements,* in which he has given a contrary version. We place

his contradictory statements side by side, and, as both cannot be correct, we realize that in at least one of the two he must have spoken erroneously. Thus, we have detected him in one specific error, from which may be inferred a capacity to make other errors * * *.

" * * * [I]n the present mode, the process of discrediting is in its chief aim incomparably *stronger,* because it *always* shows that the witness had made *some sort of a mistake* at some time, and thus demonstrates a capacity to make errors. In other words, both of his statements cannot be correct; one of the two must be incorrect; therefore, he shows a capacity to err. It is the repugnancy of the two that is significant * * * 'if what he says be contradictory, that removes him from all credit; for things totally opposite cannot receive belief from the attestation of any man.' "

It seems to me, therefore, that findings and conclusions of the trial court that there was no prejudice to defendant in the failure to hold a hearing on his competency to proceed, to the extent they are based on the inconsistent, self-serving testimony of defendant's former counsel, are clearly erroneous and without any substantial support.

As to 6 above, we again have an untested report from an examining psychiatrist which is accepted at face value by the trial court, over objection, and which contains a finding on which the trial court in the 27.26 hearing seems to place considerable reliance, namely, that the defendant was heavily intoxicated and the crime was the product of a state of alcoholic intoxication. The foundation for this statement by the medical examiner is puzzling. The transcript in the original trial shows that there were four witnesses, all called by the state, who were specifically asked whether defendant was drunk or had been drinking. One, Mrs. Anderson, the night clerk in the hotel, who saw defendant as he left the hotel a few minutes after the

shooting, said he was not drunk as far as she could see. Claudia Cox, at whose place defendant appeared a few minutes after the shooting and left the gun, with the statement he had shot the deceased, said he did not seem drunk and that she had on many occasions seen him when he was drunk. Clara Powell, who was with Claudia Cox, said she didn't pay that much attention to defendant. Janice Jean Clark, the eyewitness to the shooting, said she did not know whether he had been drinking or not. The trial testimony from the state's witnesses, therefore, does not show any evidence of drinking. Yet the medical examiner, in 1967, concludes the crime was "the product of a state of alcoholic intoxication." In arriving at this conclusion the report takes into consideration the history as given by defendant to the examiner, saying it indicates "in all probability" defendant was "heavily intoxicated". The same report, however, says that the man whose statement of history is being accepted is "unfit to proceed at this point", has paranoid schizophrenia, his mental condition "has deteriorated markedly" since the first examination in 1964 (when he was described as "functioning within the borderline range of intellectuality"), that defendant should be hospitalized in a mental hospital for closed ward psychiatric treatment, and is unable to understand the proceedings against him and to assist in his own defense. I fail to see how this report under the above circumstances can be regarded as substantial evidence tending to support the findings and conclusions of the trial court. Taking into consideration the entire record before the court in the 27.26 proceeding (which included the record in the first trial), I believe the findings, conclusions and judgment of the trial court in the 27.26 proceeding were clearly erroneous and that since the mandatory procedures of § 552.020

for a hearing on fitness to proceed when the issue is in dispute were not followed in the original trial, that the judgment must be vacated and set aside and defendant given a new trial.

Finally, it seems to me the findings of the trial court are also clearly erroneous on the issue of competency of counsel. Konomos held himself out as an experienced specialist in criminal law. Yet he was not aware that the law had been changed in Missouri so that the defendant could not be held criminally liable for his conduct if by reason of mental disease or defect he did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law. The trial did not start until March 30, 1964. The new law became effective October 13, 1963. In that length of time, as a specialist in the field, Konomos should have known about it. Konomos tried to convince the jury his client had a mental disease or defect. He told the jury he would prove defendant was "incompetent". He read Dr. Waraich's report to the jury and commented on it. He argued the defendant was a schizophrenic, that he was next to the borderline of insanity, had no intent to kill, needed treatment, not punishment, yet he also told the jury the issue they must decide was whether defendant knew right from wrong, and the only instructions counsel offered were based on whether defendant was incapable of determining right from wrong. These instructions would have held defendant to a more rigorous standard than the law required where mental defect or disease is involved. They further illustrate counsel's lack of knowledge of the only defense available. Defendant's representation by counsel was below the acceptable standard.

I, therefore, respectfully dissent.